609 P.2d 48

**STATE of Arizona, Appellee,**

v.

**Luis Morine MATA, Appellant.**

**No. 4104.**

Supreme Court of Arizona,
In Banc.

March 11, 1980.

Robert K. Corbin, Atty. Gen., William J. Schafer, III, Chief Counsel, Crim. Div., Lynn Hamilton, Asst. Attys. Gen., Phoenix, for appellee.

James Hamilton Kemper, Don Bennett Moon, Phoenix, for appellant.

GORDON, Justice:

Defendant Luis Morine Mata appeals from a conviction and sentence of death for first degree murder. Having jurisdiction pursuant to A.R.S. § 13–4031, we affirm.

In the early morning hours of March 11, 1977, police found the body of Debra Lee Lopez at the side of a road in West Phoenix. The twenty-one year old woman had died as the result of her throat being severed through to the spine. The defendant and his brother Alonzo Mata were arrested and charged with first degree murder.

Testimony at trial revealed the following account of the events leading up to the victim's death. After an evening out, the Mata brothers were joined by the victim and George Castro Harrange,[1] both acquaintances of the Matas. All four left a neighborhood bar, walked to the Mata's nearby apartment, and began watching television. According to Castro, the victim got up to leave after about ten minutes, at which point Luis grabbed her by the hair and announced that they were going to rape her. Thereafter, the Mata brothers beat the victim, Luis with his fists and Alonzo with a rifle, and successively raped her. At one point, Luis and the victim fell off the bed, whereupon Luis picked her up by the hair and beat her head against the cement floor. The victim soon regained consciousness and attempted to run away after Luis announced that they were going to kill her and throw her in the river. A neighbor testified that he heard terrified screams, and that he saw Alonzo throw a rifle inside a car and that another man carried either a person or a box to the car and deposited it in the front seat. The car departed. According to the confessions of the brothers, after the beatings and rapes, the men drove the then unconscious victim away from the apartment, and Luis killed her at the side of the road by cutting her throat with a knife.

The Mata brothers were jointly tried by jury and convicted of first degree murder. Both were initially sentenced to death. Upon remand and resentencing pursuant to *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied*, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478, Luis was again sentenced to death, and Alonzo received a life sentence. Each filed a separate appeal.

Luis Mata raises the following issues for this Court's consideration:

(1) The trial court improperly restricted the defendant's cross-examination of George Castro;

(2) Defendant's Fifth Amendment right to remain silent was violated by remarks made by both the judge and prosecutor that called attention to defendant's failure to testify;

(3) The trial court violated defendant's Sixth Amendment confrontation right by denying his motion to sever;

(4) The warrantless search of defendant's apartment and the subsequent seizure of evidence violated defendant's rights under the Fourth Amendment;

(5) Defendant was denied a fair trial by improper communication between the judge and jury, both directly and through court personnel;

(6) Resentencing defendant to death after remand pursuant to *State v. Watson, supra*, was illegal.

## CROSS–EXAMINATION RESTRICTION

■ George Castro was the principal witness against the Matas. During cross-examination by defendant's counsel, Castro denied having had intercourse with the victim that evening prior to the rapes.[2] When counsel asked if Castro had ever had intercourse with the victim prior to that evening, the court sustained the state's objection on the basis of relevancy.

Defendant contends that the court erred in so ruling, because it denied him the opportunity to show everything that might affect a witness' credibility, including the fact that a witness is biased, prejudiced or

---

1. Though sworn in as "George Castro Harrange" at trial, this witness was thereafter referred to as "George Castro."

2. Both brothers claimed in their confessions that the victim and Castro had had consensual intercourse in the apartment in their presence just before the rapes. In fact, pubic hair combings from the victim produced specimens consistent with those taken from Castro and not the Matas.

hostile. *State v. Ramos*, 108 Ariz. 36, 492 P.2d 697 (1972). We perceive no reason, and defendant suggests none, whereby Castro would have had a different motivation to testify if he had, prior to that night, had intercourse with the victim. The question was not relevant, and the trial court correctly sustained the state's objection.

■ Also during cross-examination, both defense attorneys raised a number of prior inconsistent statements that Castro had made under oath in previous proceedings, in order to impeach Castro's credibility. The state, on redirect examination, elicited from Castro several explanations for the inconsistencies, including nervousness, fear and illness. During recross-examination, defendant's counsel attempted to ascertain Castro's regard for the truth at the various times he had testified at previous proceedings. Castro again attempted to explain previous inconsistent statements under oath, and the following ensued:

\* \* \* \* \* \*

"MR. WOLLSCHLAGER: Q. And when they asked you to tell the truth in this trial, did it mean more to you than when you were asked all the other times to tell the truth?

"A. No, well—yes, what they told me yesterday I am saying truth yesterday, and today.

"Q. *But you didn't care whether it was the truth or not before.*" (Emphasis added.)

The court sustained the state's objection to the latter question, and defendant challenges this ruling, too, as unduly restrictive of his cross-examination right. We consider the question both argumentative, when viewed in juxtaposition with all the questioning that preceded it, and not responsive to a new issue arising during redirect examination. *See State v. Jones*, 110 Ariz. 546, 521· P.2d 978, *cert. denied*, 419 U.S. 1004, 95 S.Ct. 324, 42 L.Ed.2d 280 (1974); *General Petroleum Corp. v. Barker*,

77 Ariz. 235, 269 P.2d 729 (1954). Thus, it was well within the broad discretion permitted the trial court in deciding the scope of recross-examination. *See State v. Jones, supra; General Petroleum Corp. v. Barker, supra.*

## COMMENTS ON SILENCE

Defendant asserts that the following statements violated his Fifth Amendment right to remain silent, because they pointed out to the jury that he did not testify in his own behalf.

In preparing to recess for the weekend, the trial judge reminded the jury of the previous admonitions he had given them and went on to say:

"State has not completed its direct case and *you haven't heard anything from the defendant* and because now, because we haven't heard anything, it would be an inappropriate time to make up your mind and you want to keep a free, clear and open mind, to help yourself so that you don't want to discuss this case with anyone else or with anybody else because when you do you have a tendency to put yourself in a position where it's difficult to extricate yourself." (Emphasis added.)

During closing argument, the prosecutor made this statement:

"Now, let's talk about corroborative testimony. Luis testifies—strike that. Luis made a comment in the admission to Detective Dryden \* \* \*."

■ It is constitutionally impermissible for a prosecutor or a trial judge to comment on a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Such conduct is also violative of state statute:

"The defendant's neglect or refusal to be a witness in his own behalf shall not in any manner prejudice him, or be used against him on the trial or proceedings." A.R.S. § 13–117(B).[3]

3. Formerly § 13–163. Renumbered as § 13–117 by Laws 1977, Ch. 142, § 40, effective October 1, 1978.

Not all comments, however, are improper. The Supreme Court in *Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978), specifically rejected the argument that it is a violation of the Fifth Amendment privilege against self-incrimination, as perceived in *Griffin*, to draw the jury's attention *in any way* to a defendant's failure to testify. To be constitutionally proscribed, a comment must be adverse; that is, it must support an unfavorable inference against the defendant and, therefore, operate as a penalty imposed for exercising a constitutional privilege. *See Lakeside, supra.*

■ In the case at bar, the contexts in which the remarks were made, as well as the subsequent curative conduct of the court, preclude their support of an unfavorable inference against the defendant. The remarks were inadvertent and immediately corrected. The trial judge, after his own mistake was pointed out to him, explained to the jurors the state's burden of proof and the defendant's right not to testify. He also explained that he had been referring to arguments and instructions and that all he was attempting to convey to them was that they must not make up their minds until they had received "all the data involved." Moreover, the judge later gave specific and clear instructions to the jury on burden of proof and failure to testify. *See State v. White*, 115 Ariz. 199, 564 P.2d 888 (1977); *United States v. Haynes*, 573 F.2d 236 (5th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978). We conclude, therefore, that the remarks did not constitute reversible error.

## DENIAL OF SEVERANCE

■ The inculpatory statements made to police by defendant and his brother Alonzo were presented at trial through the testimony of the officer who had taken the statements. Each confession also implicated the other brother in the crime. Prior to trial, defendant moved for severance, citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and claiming

that the introduction of Alonzo's statement would deny him his Sixth Amendment right of confrontation, because Alonzo would not testify and, thus, not be subject to cross-examination. Defendant's motion was denied, and he renews on appeal his previous challenge on *Bruton* grounds.

On May 29, 1979, after defendant had filed briefs in this case, the United States Supreme Court decided a case, which is controlling on this issue. In *Parker v. Randolph*, 442 U.S. 62, 64, 99 S.Ct. 2132, 2135, 60 L.Ed.2d 713, 718 (1979), the Court held that *Bruton* does not require reversal when a defendant has himself made a confession which "'interlocks' with and supports the confession of his codefendant." We find that the confessions of the Mata brothers did interlock in that they were consistent on the major elements of the crime and there was nothing in Alonzo's confession that implicated the defendant any more in the commission of the crime than did his own confession. *See United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45 (2nd Cir.), *cert. denied*, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975). The trial court therefore, did not err in denying severance.

## WARRANTLESS SEARCH AND SEIZURE

Prior to trial, both defendants moved to suppress certain items of evidence seized without a warrant from Luis' apartment on the morning of the crime. This motion was denied. Defendant again challenges the search and seizure as violative of his Fourth Amendment rights.

At the hearing on the motion to suppress, Officer Lionel Espindola gave the following account of the search and seizure. He received a radio call on the morning of the crime that a baby was being shot at defendant's apartment complex. When he arrived at the scene, Espindola came upon Castro, who was at that point very excited and emotional and kept repeating in a combination of Spanish and English that his baby had been shot.[4] Castro told the officer that

---

4. Upon cross-examination, Castro denied having referred to the victim as "baby" in either English or Spanish. Because of Castro's language difficulties and near-hysterical state, it is

two men had taken a girl in the car and were going to the river to kill her. He also kept saying that his baby had been shot, and he pointed to the apartment. Espindola and another officer followed Castro to the apartment and entered with weapons drawn. They inspected the apartment, and Castro pointed to a woman's jacket, sandals, and a pair of panties on the floor and began relating what had happened. Espindola looked through the pockets of the jacket, found identification papers in a pocket and seized the three items. The jacket was subsequently introduced as evidence at trial.[5]

The Fourth Amendment does not prohibit the police from entering and searching a premises without a warrant when they reasonably believe someone within is in need of immediate aid. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). In view of the initial radio call referring to a baby, Castro's emotional state and language difficulties, as well as his repeated statements that Espindola heard as references to his baby having been shot, we believe that Espindola reasonably believed someone within the apartment might have been in danger when he entered to "check welfare." The entry and subsequent search were, therefore, justified by exigent circumstances.

Defendant insists that, even if the initial entry was justified, the seizures were illegal because they did not occur until the officers were sure that no one in the apartment was in danger. Because the police were lawfully on the premises, however, the "plain view" doctrine permits them to seize items which inadvertently come into view. *Mincey v. Arizona, supra; Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Cook*, 115 Ariz. 188, 564 P.2d 877 (1977); *State v. Siqueiros*, 121 Ariz. 465, 591 P.2d 557 (App.1978). We hold that the items seized were in plain view and were, thus, lawfully seized.

possible that his articulation of the victim's name, "Debbie," was misunderstood to be "baby."

**5.** The other two items, as well as several other items taken from the apartment a short time

Defendant's final Fourth Amendment argument is that the items seized were not fruits or instrumentalities of a crime and that they had no value to the officers at the time except as potential evidence if a crime were later discovered. The distinction between "instrumentalities of crime" and "mere evidence" was abandoned by the United States Supreme Court in *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). *Coolidge v. New Hampshire, supra*. We have said that the items seized must be tied to criminal activity, either intrinsically or through an officer's knowledge and reasonable belief. *State v. Cook, supra; see Warden v. Hayden, supra.* In the instant case, Espindola reasonably believed that the items were tied to criminal activity, in light of Castro's story. The trial court was correct in denying defendant's motion to suppress.

## COMMUNICATION BETWEEN JUDGE AND JURY

Defendant next argues that the following four incidents of communication between the judge and jury, either directly or through court personnel, were improper and deprived him of a fair trial.

(1) During trial, defendant moved for a mistrial because he had learned that one of the jurors may have seen him in handcuffs during a recess. The judge decided to personally interview the juror to ascertain whether she had in fact seen the defendant in handcuffs and, if so, whether she had been influenced by the sight:

"THE COURT: * * * Gentlemen, do you want me to have the conference between her and me reported or can I just discuss it with her personally and satisfy myself?

"MR. WOLLSCHLAGER: On behalf of defendant Luis Mata, I request it be reported, Your Honor.

later, were not introduced as evidence at trial, according to the list of exhibits included in the record on appeal.

"THE COURT: That's fine. We will have a reporter in but not counsel." Counsel did not object to this interview outside his own and his client's presence. The judge conducted the interview, the transcript of which is included in the record. As the judge reported back to counsel, the juror explained that she had not seen the handcuffs and that if she had seen them, it would not have influenced her. She also promised not to discuss the matter with any other jurors. Counsel agreed that, under the circumstances, there was no basis for the motion for a mistrial, and he expressed appreciation for the court's indulgence.

(2) During the testimony of George Castro, there was confusion because of translation problems. One of the jurors asked the bailiff whether or not Castro's testimony had been that Alonzo had objected to the killing. The bailiff relayed the question to the judge. Without notifying defense counsel, the judge advised the bailiff to tell the juror that he would have to rely on the testimony he had heard and that any question he had would probably be clarified by further cross-examination or by the state's redirect examination.

(3) Another juror asked the bailiff whether the brothers were being tried together or separately. Again without counsel's knowledge, the court informed the juror, through the bailiff, that the issue would be clarified by the court's instructions. These two incidents (nos. 2 and 3) came to the attention of one of the defense attorneys, who objected to them during the trial. For the record, the judge described the communications in detail. Both defendants moved for a mistrial. The bailiff was sworn in and testified to the circumstances of both communications, verifying the judge's depiction of the incidents in every detail.

(4) The judge also revealed, for the record, that he had received a call from one of the jurors, who was pregnant and concerned that she might not be able to continue on the panel. He discussed her condition with her and with her doctor, and the decision was made that she would continue until a physical problem arose. After describing this incident to counsel, the judge asked if anyone had any objections or wanted to make a record. Both defense counsel said no.

█ As to communications no. 1 and no. 4, we find that counsel did not lodge timely objections.[6] Absent fundamental error, the lack of a timely objection at trial operates as a waiver for purposes of appeal. *E. g. State v. Newman*, 122 Ariz. 433, 595 P.2d 665 (1979); *State v. Byrd*, 109 Ariz. 10, 503 P.2d 958 (1972). Neither communication can be considered fundamental error because it is obvious that neither communication went to the foundation of the case nor took from the defendant a right essential to his defense. *State v. Gamble*, 111 Ariz. 25, 523 P.2d 53 (1974); *State v. Nettz*, 114 Ariz. 296, 560 P.2d 814 (App.1977).

As for the incidents numbered 2 and 3, defendant contends that such communications between a judge and jury outside the presence of the defendant or counsel are improper and that prejudice need not be shown to establish error. He cites in support of his position such cases as *State v. Burnetts*, 80 Ariz. 208, 295 P.2d 377 (1956); *State v. Werring*, 111 Ariz. 68, 523 P.2d 499 (1974) and *State v. Robin*, 112 Ariz. 467, 543 P.2d 779 (1975).

█ The general rule in Arizona is that reversible error occurs when a trial judge communicates with jurors after they have retired to deliberate,[7] unless defendant and

6. Regarding communication no. 4, objection could have been made at the time the judge notified counsel of the incident. Pursuant to such objection, remedial measures could have been taken if necessary. For example, the judge could have questioned the juror and had her stricken from the panel if prejudice to defendant was indicated. Because counsel did not object, the judge was not afforded the opportunity to take curative steps.

7. We note that none of the instant communications occurred after the jury retired to deliberate. This aspect of the general rule is derived from 17 A.R.S., Rules of Criminal Procedure, rule 22.3, which provides: "After the jurors have retired to consider their verdict, if they

counsel have been notified and given an opportunity to be present. *State v. Lamb,* 116 Ariz. 134, 568 P.2d 1032 (1977); *State v. Robin, supra; State v. Werring, supra; State v. Burnetts, supra.* While the cases cited by defendant do hold that prejudice need not be shown, all of these cases involved situations fraught with potential for prejudice to defendant,[8] wherein it was impossible to ascertain the impact of the communication upon the jury. *See* also *United States v. Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). Such circumstances warrant an irrebuttable presumption of prejudice. *See State v. Davis,* 117 Ariz. 5, 570 P.2d 776 (1977). Where it may be said, beyond a reasonable doubt, that there was no prejudice to the defendant, a communication between judge and jury outside the presence of defendant and counsel is harmless error. *See State v. Lawrence,* 123 Ariz. 301, 599 P.2d 754 (1979); *State v. Davis, supra. See generally Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ We are convinced, after examination of the record in which the communications were amply preserved for appeal, that no prejudice resulted to defendant. The court's responses to both inquiries operated, in fact, as refusals to answer. They did not involve the judge giving the jury information as to either the facts of the case or the law of the case, and we cannot conceive of any coercive effect that they could possibly have had upon the jury. *See State v. Corrales,* 121 Ariz. 104, 588 P.2d 846 (App.1978). We, therefore, find no reversible error.

## ILLEGALITY OF DEATH SENTENCE

■ Finally, defendant challenges the Arizona death penalty statute, A.R.S. § 13–454,[9] as unconstitutional on a number of grounds, most of which we have considered and adjudicated in *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978) and the Supplemental Opinion to *Watson, cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478. We reaffirm our holdings in these opinions.

In addition to the challenges disposed of at length in *Watson,* defendant raises a cruel and unusual punishment objection under the Eighth Amendment and two Fourteenth Amendment, due process objections. First, defendant argues that his death sentence is proscribed by the Eighth and Fourteenth Amendments, because it was judicially imposed and not authorized by statute. Since we have held that the death penalty is authorized by a valid, enforcible statute in Arizona, *see Watson, supra,* defendant's contention is without merit.

Next, defendant asserts that the death penalty statute, as approved in *Watson,* violates due process because it will lead to arbitrary imposition of the death penalty. Defendant reasons that such arbitrariness will result because courts are given no guidance as to what may be considered in mitigation and no guidance in balancing the quantity or quality of any mitigating factors against the quantity or quality of any aggravating factors.

As to the lack of guidance in what may be considered in mitigation, we point out

8. Both *Burnetts* and *Werring* involved the actual physical intrusion by the judge into the jury-room, where he communicated orally with the panel on issues of fact and law. In *Robin,* the judge responded to questions of fact from the jury by answering from his notes and his recollection of testimony.

9. Amended and renumbered A.R.S. § 13–703, effective October 1, 1978.

desire to have any testimony repeated, or if they or any party request additional instructions, the court may recall them to the courtroom and order the testimony read or give appropriate additional instructions. The court may also order other testimony read or give other instructions, so as not to give undue prominence to the particular testimony or instructions requested. Such testimony may be read or instructions given only after notice to the parties." We see no reason to be less concerned with a potential violation of defendant's rights if a communication occurs before the jury retires to deliberate.

that such a policy of unlimited mitigation is expressly mandated by the United States Supreme Court. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Its purpose is to protect defendants by obviating the "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Lockett*, 438 U.S. at 605, 98 S.Ct. at 2965, 57 L.Ed.2d at 990.

As to guidelines for balancing aggravating and mitigating factors defendant raises a legal dilemma which has long plagued courts. This is the problem of striking a balance between the need for flexibility in order to afford individualized decision-making essential in capital cases, *see Lockett, supra,* and the need for appropriate standards to prevent the arbitrariness that accompanies unbridled discretion. *Cf. Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). By its own admission, "[t]he signals from * * * [the United States Supreme] Court have not * * * always been easy to decipher." *Lockett,* 438 U.S. at 602, 98 S.Ct. at 2963, 57 L.Ed.2d at 988. *Compare, McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) *with Gregg v. Georgia, supra.*

In *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), however, the Court was presented with the precise due process issue raised by defendant. It found that Florida's capital sentencing procedures, which are very similar to Arizona's, *see State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977), satisfied the requirements of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and, thus, comported with due process:

> "While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are

satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." 428 U.S. at 258, 96 S.Ct. at 2969, 49 L.Ed.2d at 926.

We conclude, as we have previously, *see State v. Richmond, supra,* that Arizona's death penalty statute is not violative of due process.

Pursuant to A.R.S. § 13–4031 and § 13–4037, we have carefully scrutinized the entire record to determine if the death sentence was erroneously imposed upon defendant. *See, e. g., State v. Richmond, supra.* Upon our independent review of the facts, we conclude that the trial court was correct in finding the presence of two aggravating circumstances [10] and the absence of any mitigating circumstances. We do not consider defendant's sentence excessive in relation to the penalty imposed in similar cases, considering both the crime and the defendant. *Richmond, supra.* Accordingly, the conviction and sentence of the Superior Court are affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and CAMERON, JJ., concur.

---

10. The two aggravating circumstances found by the trial court were:

(1) that defendant had been convicted of another offense in the United States for which, under Arizona law, a sentence of life imprisonment or death was imposable; and

(2) that defendant committed the offense in an especially heinous, cruel or depraved manner.