665 P.2d 70

**STATE of Arizona, Appellee,**

v.

**Lewis Stevenson McDANIEL, Appellant.**

**No. 4220–2.**

Supreme Court of Arizona,
In Banc.

April 28, 1983.

Rehearing Denied June 8, 1983.

Robert K. Corbin, Atty. Gen., Phoenix, John R. Callahan, Tempe, for appellee.

Stephen M.R. Rempe, Phoenix, for appellant.

Lewis Stevenson McDaniel, in pro per.

GORDON, Vice Chief Justice:

A jury found appellant guilty of first degree murder, robbery, and kidnapping. Following an aggravation-mitigation hearing, the defendant was sentenced to death for the first degree murder conviction, 9–10 years imprisonment for the kidnapping conviction and 20 years to life for the robbery conviction to run concurrently with the sentence for kidnapping. Appellant now challenges the first degree murder conviction on the basis of several allegations of error. We have jurisdiction pursuant to Ariz. Const. Art. 6, § 5(3) and A.R.S. §§ 13–4031 and 13–4033. We affirm the judgment of guilt and conviction on all charges but modify the sentence imposed for the first degree murder conviction.

This case has been the subject of four trials—the first ending in the granting of a motion for a new trial, the second ending when the defendant's conviction was later reversed by this Court, see *State v. McDaniel*, 127 Ariz. 13, 617 P.2d 1129 (1980), the third ending in a mistrial, and the fourth being reviewed presently. The facts are essentially as follows:

The victim, Arthur Kaehler, worked at Sky Harbor Airport in Phoenix loading baggage for American Airlines. After getting off work early in the morning of August 4, 1975, Kaehler drove to East Van Buren Street where he picked up a prostitute named Alice Watkins. Although she refused to have sex with Kaehler, Watkins agreed to take him to her apartment in South Phoenix. Seven people lived in the

apartment from time to time: Alice Watkins; Lewis McDaniel, her boyfriend; Theresa Hill, another prostitute; Mark Rich, Theresa's boyfriend; Cathy Gaines, Watkins' sister; and Watkins' two young children.

When Kaehler and Watkins arrived at the apartment, Alice agreed to go inside and ask Theresa if she wanted to have sex with Kaehler. Kaehler followed her inside, and after drinking and dancing with Alice, Theresa and Cathy, Kaehler went into a bedroom with Theresa.

While Theresa and Kaehler were in the bedroom, the defendant and Mark Rich returned to the apartment. They went outside the apartment, and after observing Kaehler and Hill through the bedroom window, returned to the apartment. Rich then entered the bedroom, demanding to know what Kaehler was doing with his wife (Theresa was not in fact his wife). The defendant also entered the room and both men held Kaehler at gunpoint while at the same time hitting and kicking him. Although the evidence is not clear as to who did what, there is no question that Kaehler was tied up and liquor was poured down his throat. His wallet, watch, and ring were taken from him. Kaehler, gagged, hog-tied and wrapped in a blanket, was then locked in the trunk of his own car. Mark, Alice and Theresa drove the victim's car to an apartment complex near 40th Street in South Phoenix, parked, and left the vehicle with the windows open, keys in the ignition, and Kaehler still locked . in the trunk. There was evidence introduced at trial that Kaehler was alive and making noise inside the trunk during the drive. The defendant followed in his own car, picked up the other three, and they all returned to the apartment. Kaehler, who was found two days later, died of heat exhaustion or suffocation in the extreme heat of the trunk.

All five of the adults living in the apartment were arrested. Alice and Theresa pled guilty to manslaughter and were incarcerated in the Arizona State Prison and have since served their sentence. Mark, still a juvenile, was processed through the juvenile corrections system. Cathy was granted immunity in exchange for her testimony.

Appellant raises several issues on appeal: (1) whether the trial court erred by not asking the voir dire question requested by the defense regarding the death penalty; (2) whether the trial court improperly prohibited the defense from calling Watkins and Rich to testify; (3) whether the trial court erred by not compelling the state to disclose the notes of Ken Chambers; (4) whether the trial court improperly allowed the preliminary hearing testimony of Theresa Hill to be read into the trial record; (5) whether a gun was improperly admitted into evidence; (6) whether the trial court improperly treated Denise Androvandi's trial testimony regarding McDaniel's statements as non-hearsay; (7) whether the prosecutor's closing statement was improper; (8) whether the trial court improperly replied to notes submitted by the jury during deliberations; (9) whether McDaniel had ineffective assistance of counsel; and (10) whether the death penalty was improperly imposed.

## VOIR DIRE

The defendant alleges that the trial court erred in not asking the following question on voir dire:

"A person convicted of first degree murder in the State of Arizona may be punished by life imprisonment, to wit: a minimum of 25 calendar years, or by death in the gas chambers [sic]. If Mr. McDaniel is found guilty of first degree murder, the Court that is, the Judge, without any verdict or advice from the jury then must determine the punishment. Do you entertain any conscious or religious opinion concerning the death penalty which would prevent you from finding the defendant guilty even though you are satisfied beyond a reasonable doubt from the evidence that he is in fact guilty of first degree murder?"

■ The purpose of jury voir dire examination is to unveil a juror's prejudice so that the parties can exercise intelligently

their peremptory challenges and challenges for cause. *State v. Melendez,* 121 Ariz. 1, 588 P.2d 294 (1978); *State v. Verive,* 128 Ariz. 570, 627 P.2d 721 (App.1981). Rule 18.5(d) Ariz.R.Crim.P. requires the trial court to conduct voir dire examination by putting to the jurors all appropriate questions requested by counsel. We have consistently held that the scope of voir dire is left to the sound discretion of the trial court and as long as there is no abuse of discretion error will not be found on appeal. *State v. Baumann,* 125 Ariz. 404, 610 P.2d 38 (1980); *State v. Rose,* 121 Ariz. 131, 589 P.2d 5 (1978).

■ In support of his position the defendant relies on *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In that case the United States Supreme Court held that where all jurors opposed to the death penalty are systematically excluded, the jury's sentence of death is unconstitutional as it denies the defendant the right to an impartial jury. There is no requirement in *Witherspoon,* however, that the trial judge ask jurors on voir dire what their feelings towards the death penalty are or if those feelings would effect their determination of guilt or innocence. Even if the trial court in this case were required to make such an inquiry, we do not see how the failure to do so could have adversely affected the defendant. If the question had been answered affirmatively the state would have been permitted to strike the juror for cause. *See Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Witherspoon v. Illinois, supra.* Had the question been answered in the negative, neither the state nor the defense would have been permitted to strike the juror for cause and in exercising its peremptory challenges the defense would have been in no better position than if the question had never been asked. We therefore find that the trial judge's decision not to ask the defendant's question did not affect McDaniel's right to a fair and impartial jury.

## CALLING OF WITNESSES

McDaniel claims that the trial court erred in refusing to allow him to call Alice Watkins and Mark Rich to testify even though it was known that they would invoke their Fifth Amendment privilege. McDaniel's purpose in calling Watkins and Rich to testify was to show that they actually perpetrated the crime and that they lied at the prior trial to implicate McDaniel. During the trial the judge held an in camera hearing during which it was established that Rich and Watkins would invoke the Fifth Amendment in response to all questions asked by both the prosecution and the defense. Both individuals stated that the privilege would be invoked based on their fear of resulting perjury charges. The trial judge ruled that because the witnesses would not answer any questions regarding prior testimony, there would be no substantive value in allowing the defendant to call them to testify.

McDaniel's counsel directs the Court's attention to a line of Arizona cases dealing with both the defendant's and prosecution's right to call witnesses who have already made clear that they intend to invoke the Fifth Amendment. *See State v. Gretzler,* 126 Ariz. 60, 612 P.2d 1023 (1980); *State v. Ortiz,* 113 Ariz. 60, 546 P.2d 796 (1976); *State v. Cota,* 102 Ariz. 416, 432 P.2d 428, *cert. denied,* 390 U.S. 1008, 88 S.Ct. 1256, 20 L.Ed.2d 109 (1967). In *Cota, supra,* the prosecution called the co-defendant to testify who, after answering several preliminary questions, invoked the Fifth Amendment when asked about the murder for which the defendant was being tried. On appeal the defense counsel argued that it was error to allow the state to call the co-defendant since it was the prosecutor's strategy to tie the co-defendant and the defendant together and therefore when the co-defendant refused to testify the defendant would appear guilty to the jury. We stated that the co-defendant's testimony was material to the state's case and that the privilege against self-incrimination was a personal immunity for the witnesses which did not disqualify him from being called. We ruled that the state had a right to show that it was presenting all of the relevant evidence

at its disposal in order to prove its theory of the case. In *Ortiz, supra,* we expanded *Cota* and applied the right to call witnesses who intend to invoke the Fifth Amendment to defendants as well as prosecutors. The same issue was most recently discussed in *Gretzler, supra,* where we stated:

"In *State v. Ortiz,* the trial court ruled that the defense should be precluded from calling two witnesses who would certainly invoke their privilege against self-incrimination. We reversed on Sixth Amendment grounds. We held that while the defendant's Sixth Amendment right to call witnesses would not enable him to force them to speak, he was entitled to show that he had presented 'all the relevant evidence at [his] disposal.'" (citations omitted)

126 Ariz. at 88, 612 P.2d at 1051. We found that the trial court erred in prohibiting Gretzler's counsel from calling his co-defendant, Willie Steelman, even though it was apparent that he would claim the privilege against self-incrimination and not testify. In light of the solid evidence upon which Gretzler's conviction was based, however, we held that the error was harmless.

In *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the United States Supreme Court held that a defendant's Sixth Amendment right to have compulsory process requires that he must be allowed the right to call witnesses whose testimony would be "relevant and material to the defense." *Id.* at 23, 87 S.Ct. at 1925, 18 L.Ed.2d at 1025. The Court recently discussed its holding in *Washington* and re-emphasized that an individual cannot establish a Sixth Amendment violation without "some showing that the evidence lost would be both material and favorable to the defense." *United States v. Valenzuela-Bernal,* —— U.S. ——, ——, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193, 1206 (1982). In light of these decisions, we must modify our prior holdings in *Cota, Ortiz,* and *Gretzler,* insofar as they suggest an *absolute* right to call witnesses regardless of the fact that they may properly choose to invoke their Fifth Amendment privilege in response to all relevant questions. If upon conducting an in camera hearing the trial judge determines that a witness could legitimately refuse to answer essentially all relevant questions, then that witness may be totally excused without violating an individual's Sixth Amendment right to compulsory process. *See United States v. Moore,* 682 F.2d 853 (9th Cir.1982); *United States v. Goodwin,* 625 F.2d 693 (5th Cir.1980); *United States v. Gomez-Rojas,* 507 F.2d 1213 (5th Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). We emphasize, however, that this exception is a narrow one. It is only applicable when the trial judge has extensive knowledge of the case and rules that the Fifth Amendment would be properly invoked in response to all relevant questions that the party calling the witness plans on asking.

In the instant case both Rich and Watkins appeared before the trial judge at an in camera hearing, responded to the judge's questions, and stated that they would refuse to answer all questions regarding Kaehler's death due to fears of future perjury prosecutions. The trial judge specifically found that Watkins and Rich would properly invoke the Fifth Amendment in response to all questions the defense counsel stated that he would ask. The defense argues that even if both individuals indicated that they would take the Fifth, he should still be allowed to call them to the stand, ask questions in response to which the privilege would be invoked, and then argue to the jury that the invocation of the Fifth Amendment supports the inference that Watkins and Rich had lied at the prior trials to implicate McDaniel. It is well settled that in criminal cases the jury is not entitled to draw any inferences from the decision of a witness to exercise his Fifth Amendment privilege. *United States v. Nunez,* 668 F.2d 1116 (10th Cir.1981); *United States v. Vandetti,* 623 F.2d 1144 (6th Cir.1980); *United States v. Lacouture,* 495 F.2d 1237 (5th Cir.), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974); *United States v. Johnson,* 488 F.2d 1206 (1st Cir.1973); *Bowles v. United States,* 439 F.2d 536 (D.C.Cir.1970), *cert.*

*denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971); *see also Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). Therefore, we believe that material and favorable evidence was not lost when the trial court denied defense counsel's request to call Watkins and Rich to testify. We find no error.

## TESTIMONY OF KEN CHAMBERS

Defendant raises two allegations of error concerning the testimony of Ken Chambers. Chambers, a private investigator, was hired by Theresa Hill to investigate the victim's death. At the trial Chambers described how his investigations led him to McDaniel as well as the substance of conversations that he had with the defendant. McDaniel claims that because Chambers was not a credible witness the trial court erred in allowing him to testify. The defendant also claims that the trial court erred by not requiring the state to disclose the notes taken by Chambers based on his conversations with McDaniel.

■ The credibility of witnesses is an issue to be resolved by the trier of fact. *State v. Roberts,* 126 Ariz. 92, 612 P.2d 1055 (1980); *State v. Pike,* 113 Ariz. 511, 557 P.2d 1068 (1976). In the instant case several individuals gave testimony expressing their opinions of Chambers' poor reputation for truthfulness and honesty in the community. We believe that after considering Chambers' testimony, as well as the opinion evidence, it was the jury's duty to give the weight it felt appropriate to Chambers' testimony. Udall & Livermore, Law of Evidence § 3, at 4 (2d ed. 1982).

■ We also find defendant's claim regarding notes taken by Chambers while investigating McDaniel to be without merit. Rule 15.1(a) Ariz.R.Crim.P. requires that the state disclose material which falls under one of the enumerated categories and is within its possession and control. The record reflects that the state did not have Chambers' notes in its possession or control. Chambers was hired by Theresa Hill's attorney to investigate the circumstances surrounding the homicide of Kaehler. At the time the notes were taken Chambers was in no way associated with the state. At the second trial Chambers testified that the notes were destroyed prior to McDaniel's first trial. The state cannot be held to disclose material it does not possess. We find no error.

## PRIOR TESTIMONY OF THERESA HILL

At the preliminary hearing Theresa Hill, one of the women who lived in the apartment where Kaehler was allegedly beaten, gave testimony concerning the defendant's involvement in the murder of the victim. The defendant's attorney had the opportunity and did, in fact, thoroughly cross-examine Hill. The defendant now alleges that the trial court erred in admitting Hill's statement as prior testimony since the state failed to put on a good faith effort to discover her whereabouts.

■ Rule 19.3(c)(1) Ariz.R.Crim.P. provides that statements made under oath by a party or witness during a previous judicial proceeding are admissible if "the party against whom the former testimony is offered * * * was given and had the right and opportunity to cross-examine the declarant * * * and the declarant is unavailable as a witness * * *." In order to satisfy the Sixth Amendment right to confront witnesses in this case, both the opportunity to cross-examine and the declarant's unavailability must be established. See *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In the instant case it is not contested that the defendant had the opportunity to cross-examine Theresa Hill. Whether or not a witness is "unavailable" within the rule depends on whether the state has made a good faith effort to secure the presence of the witness at trial. *Ohio v. Roberts, supra; Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *State v. Ray,* 123 Ariz. 171, 598 P.2d 990 (1979). "Good faith" is not subject to a precise definition and whether such effort has been made is left to the sound discretion of the trial judge to be determined on a

case by case basis. *State v. Owens*, 103 Ariz. 541, 447 P.2d 233 (1968).

■ Prior to Hill's testimony being read to the jury, the trial judge held an in camera hearing during which the state called Harry Jennings, a detective for the Phoenix Police Department, who testified that police records were checked to see if Theresa Hill or Renee Smith (Hill's alias name) had been a suspect in a crime, or had any utility bills in Arizona. The most recent Arizona address of Hill was checked as was a later address in San Diego, California. In fact, an investigator for the San Diego district attorney's office submitted an affidavit detailing the search efforts for Hill in San Diego before McDaniel's third and fourth trials. Both driver's license and motor vehicle registration records were checked in Sacramento, California. Finally, letters containing all of the known information about Hill and subpoenas were sent to every county in Arizona. All were returned with affidavits of non-service.

For the foregoing reasons, we find that the state made a good faith effort to locate Theresa Hill and that the trial court did not abuse its discretion in allowing her preliminary hearing testimony to be read to the jury.

## ADMISSION OF GUN

McDaniel next argues that the trial court erred in allowing into evidence a pistol that was found in the apartment where the prosecution alleged Kaehler was beaten. Marcus Aurelius, a sergeant in the Phoenix Police Department, testified that he discovered the gun while searching the apartment pursuant to a search warrant. The warrant specifically listed "firearms" as one of the items for which the search was being made. At trial the defense did not object when the gun was admitted into evidence.

■ It has long been the law in Arizona that failure to object to an offer of evidence is a waiver of any ground of complaint against its admission. *State v. Tacho*, 113 Ariz. 380, 555 P.2d 338 (1976); *State v. Favors*, 92 Ariz. 147, 375 P.2d 260

(1962). As discussed later, the prosecution established adequate foundation for admitting the gun through the trial testimony of Sergeant Aurelius and Cathy Gaines, as well as the preliminary hearing testimony of Theresa Hill. Any error was waived by the lack of an objection when the prosecution moved for admission of the gun.

## TESTIMONY OF DENISE ANDROVANDI

Defendant next alleges that the trial court erred in treating Denise Androvandi's trial testimony regarding McDaniel's statements as non-hearsay. Androvandi, who met McDaniel in June, 1975, gave testimony outlining the substance of several conversations she had with the defendant after the murder of Kaehler. McDaniel told Androvandi that the "girls were in jail" because they had "told on themselves." The defendant, on the other hand, was released from custody for lack of evidence because "he didn't snitch on himself." McDaniel also stated that his involvement in the murder amounted to "standing outside watching through a window while Mark Rich beat the guy up." The trial court considered these statements admissions by a party-opponent and, thus treated Androvandi's testimony as non-hearsay. Rule 801(d)(2)(A) Ariz.R.Evid.

■ At the outset we note that determinations of whether statements are admissions by a party-opponent are within the discretion of the trial court. *State v. Schad*, 129 Ariz. 557, 633 P.2d 366 (1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982). Rule 801(d)(2)(A) Ariz. R.Evid. establishes that "a statement is not hearsay if the statement is offered against a party and is his own statement * * *." In the instant case, the state offered Androvandi's testimony to establish McDaniel's presence at the scene of the murder as well as his participation in the murder. The defendant does not contest the fact that he made the statements which were the basis of Androvandi's testimony. McDaniel claims that the state did not show that the statements he made to Androvandi related

to the case he was being prosecuted for rather than some other unrelated incident. We disagree. Androvandi testified that the conversations she had with the defendant in September, 1975, involved a homicide. They also talked about McDaniel's girl-friend, Alice Watkins, who was, according to the defendant, in jail due to the same homicide. Watkins, like the defendant, was being held as one of the individuals responsible for Kaehler's death. McDaniel also told Androvandi that although he was taken into custody for the same homicide incident, he was released due to a lack of evidence against him.[1] We believe that these statements taken together indicate that it was the Kaehler murder that McDaniel discussed with Androvandi. The trial court, therefore, properly admitted Androvandi's testimony.

## PROSECUTOR'S CLOSING STATEMENT

■■■■ McDaniel next claims that during closing argument the prosecutor expressed personal opinions with respect to the defendant's guilt and commented on McDaniel's demeanor while testifying, thus denying McDaniel of his right to a fair trial. He also claims that the prosecutor improperly referred to him as a "murderer." We have consistently held that wide latitude is given in closing arguments and counsel may comment on the evidence and argue all reasonable inferences therefrom. *State v. Zaragoza,* 135 Ariz. 63, 659 P.2d 22 (1983); *State v. Blazak,* 114 Ariz. 199, 560 P.2d 54 (1977) (quoting *State v. Gonzales,* 105 Ariz. 434, 466 P.2d 388 (1970)). Where the accused has testified, the prosecutor may properly comment upon his demeanor in the courtroom. *State v. Smith,* 122 Ariz. 50, 592 P.2d 1316 (App.1979); *State v. Wintjen,* 500 S.W.2d 39 (Mo.App.1973). We have thoroughly reviewed the prosecutor's closing argument and have found no evidence which supports the defendant's allegations. All of the prosecutor's closing remarks are either directly supported by the record or could be reasonably inferred therefrom.

We also believe that the defendant was not improperly characterized as a "murderer" since such a description could be reasonably drawn from the evidence presented at trial. *State v. Zaragoza, supra; Ruffin v. State,* 243 Ga. 95, 252 S.E.2d 472 (1979), *cert. denied,* 444 U.S. 1103, 100 S.Ct. 1070, 62 L.Ed.2d 789 (1980).

## NOTES FROM JURY

McDaniel next contends that the trial court erred in answering written questions submitted by the jury during deliberations. Two notes were submitted to the judge requesting copies of the testimony of Theresa Hill and Cathy Gaines. The judge responded in writing that "It is not available." An additional note requested information concerning the registration of the .22 caliber gun (Exhibit 36). In response to this note the judge answered: "There is no evidence before you on this subject."

■■■■ The general rule in Arizona is that error occurs when a trial judge communicates with jurors after they have retired to deliberate unless the defendant and counsel have been notified. *State v. Mata,* 125 Ariz. 233, 609 P.2d 48, *cert. denied,* 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980); *State v. Benford,* 129 Ariz. 447, 631 P.2d 1105 (App.1981); Rule 22.3 Ariz.R. Crim.P. We have thoroughly reviewed the record and find no evidence that such notification was given prior to responding to the jury's questions. We therefore conclude that the communications between judge and jury violated Rule 22.3 Ariz.R. Crim.P. and was error.

■■■■ Where it can be determined beyond a reasonable doubt that there was no prejudice to the defendant, such communication is harmless error. *State v. Mata, supra; State v. Corrales,* 121 Ariz. 104, 588 P.2d 846 (App.1978). We believe that the court's responses to the inquiries regarding witness testimony operated as a refusal to answer.

---

1. The police records show that McDaniel was, in fact, originally taken into custody in August, 1975, but later released since the evidence against McDaniel was inadequate to charge him with the murder of Kaehler.

They did not involve the judge giving the jury information as to either the facts or law of the case, and we cannot conceive of any coercive effect that they could have had upon the jury. *State v. Mata, supra; State v. Lawrence,* 123 Ariz. 301, 599 P.2d 754 (1979). Furthermore, the judge's response to the question concerning gun registration was not the type which warranted an irrebuttable presumption of prejudice to the defendant. *Cf. State v. Robin,* 112 Ariz. 467, 543 P.2d 779 (1975) (the trial judge answered from his notes and recollection questions submitted by the jury while deliberating); *State v. Werring,* 111 Ariz. 68, 523 P.2d 499 (1974) and *State v. Burnetts,* 80 Ariz. 208, 295 P.2d 377 (1956) (both cases involved the actual physical intrusion by the judge into the jury room where he communicated orally with the panel on issues of fact and law). We therefore conclude that the error was harmless.

■ McDaniel also argues that the judge's statement regarding the gun was a comment on the evidence since it amounted to a review of part of the testimony given by witnesses. We disagree. The Arizona Constitution provides that "Judges shall not charge juries with respect to matters of fact, nor comment thereon * * *." Ariz. Const. art. 6, § 27. The word "comment" has been construed to mean the expression of an opinion. *State v. Barnett,* 111 Ariz. 391, 531 P.2d 148 (1975); *State v. Willits,* 96 Ariz. 184, 393 P.2d 274 (1964). The constitutional provision, however, does not prohibit the trial court from making reference to the evidence. *State v. Barnett, supra.*

The court's response to the jury's question did not violate the constitutional provision against comment on the evidence. The court properly referred to the absence of any evidence regarding registration of the gun. The judge expressed no opinion about what was established by the evidence presented to the jury. We find no error.

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ McDaniel claims that he did not receive a fair trial because he was denied effective assistance of counsel. Since *State v. Watson,* 134 Ariz. 1, 653 P.2d 351 (1982) the standard for effective assistance of counsel in Arizona has been whether counsel showed at least minimal competence in representing the criminal defendant. In making this determination the reviewing court should focus on "*the quality of counsel's performance,* rather than on the effect of that performance on the outcome of the proceeding." *Id.* at 4, 653 P.2d at 354.

■ The burden of establishing ineffectiveness of trial counsel is on the claimant. *State v. Tison,* 129 Ariz. 546, 633 P.2d 355 (1981); *State v. Pacheco,* 121 Ariz. 88, 588 P.2d 830 (1978). Proof of ineffectiveness must be a demonstrable reality rather than a matter of speculation. *State v. Tison, supra.*

■ Appellant claims that his trial counsel inadequately cross-examined the witnesses for the state. We have thoroughly reviewed the trial record and believe that the defendant's counsel exerted reasonable efforts to discredit the state's witnesses. We also note that the manner in which cross-examination is conducted is a tactical decision to be made by the lawyer. *State v. Tison, supra.*

McDaniel asserts that his counsel's failure to call several witnesses who could develop his alibi defense, as well as his failure to ask the defendant questions on direct examination regarding the same issue, shows ineffective representation. In general, the power to control trial strategy belongs to counsel. *State v. Rodriguez,* 126 Ariz. 28, 612 P.2d 484 (1980). Furthermore, the defense counsel has ethical obligations which he must consider in planning his trial strategy. *See e.g.* Code of Professional Responsibility DR 7–102, 106. In reviewing the record, we do not believe the defendant received inadequate assistance on these grounds.

Finally, the defendant claims that his counsel should have objected to the introduction of the gun found when police searched the apartment where the prosecution alleged Kaehler was beaten. The

search warrant for the apartment specifically listed firearms and the officer supervising the search testified that the police were searching for the particular kind of gun that was found. Furthermore, Cathy Gaines testified that both the defendant and Rich were holding guns when they went into the bedroom where Kaehler and Hill were located. Hill's preliminary hearing statement indicated that McDaniel was holding a gun on Kaehler while at the same time beating him. In light of this evidence, it appears that the gun was admissible. We, therefore, do not believe that McDaniel's counsel was ineffective for failing to object.

■ Considering the record of appellant's trial as a whole, we do not believe that counsel showed less than minimal competence in representing McDaniel.

## DEATH PENALTY

The defendant's next argument is that because the jury was instructed on both felony-murder and premeditated murder, it is uncertain whether the jury returned its general verdict of first-degree murder because of McDaniel's participation in the underlying crimes of kidnapping or robbery, or due to his premeditated killing of Kaehler. In support of his position, the defendant relies on *Enmund v. Florida*, —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1980), which was decided after McDaniel was sentenced. As recently discussed in *State v. Gillies,* 135 Ariz. 503, 662 P.2d 1007 (1983), the *Enmund* decision held that a sentencing scheme which permits the imposition of the death penalty, absent a finding that a defendant killed, attempted to kill or intended to kill, is violative of the Eighth Amendment of the United States Constitution. In *Enmund* the defendant sat in the get-away car waiting to help his co-defendant escape from the farm house where the victims had been robbed and fatally shot. Under Florida law this was sufficient to find Enmund guilty of first degree murder since he had aided and abetted the underlying robbery. Because the defendant was in no way involved with the actual killings, and since there was no evidence in the record of his intent to kill, the Supreme Court reversed Florida's imposition of the death penalty.

■ We agree with the defendant's claim that in first degree murder cases where the jury is instructed on felony murder as well as premeditated murder, a general verdict finding the defendant guilty of first degree murder does not establish whether the defendant had in fact killed, attempted to kill, or intended to kill. A finding of felony murder, unlike premeditated murder, does not require that the defendant have the culpability required by *Enmund.* For example, in order to find that McDaniel committed first degree felony murder the jury only had to find that the victim was murdered while the defendant perpetrated or attempted to perpetrate robbery or kidnapping. A.R.S. § 13–452 (in effect at the time the crime was committed and now codified at A.R.S. § 13–1105(A)(2)). In order to comply with *Enmund,* therefore, we believe that in future cases where the jury might have found the defendant guilty of first degree murder based on a felony-murder theory, the trial judge must determine beyond a reasonable doubt prior to imposing a sentence of death that the defendant killed, attempted to kill or intended to kill. This determination, of course, must be in addition to those procedures specified in A.R.S. § 13–703.

■ Turning to the facts of the instant case, it is clear that McDaniel's involvement in the victim's death was significantly greater than that of the defendant in *Enmund.* The record reflects that McDaniel was a major participant in the robbery and beating of Kaehler. Together with Mark Rich, the defendant then bound the victim's hands and legs, forced him to drink alcohol, gagged and wrapped him in a blanket, and then locked him in the trunk of his car. The car was then driven to the apartment complex by McDaniel's accomplices where it was abandoned. Kaehler was found two days later dead in the trunk due to heat exhaustion or suffocation. The weather records for the day of the beating and the following two days indicate that the high temperatures were 115°, 109°, and 109°, respectively. The medical examiner, who

had conducted experiments by placing a thermometer in the trunk of a car, testified that the temperature approached 140° and that under these conditions Kaehler probably lived no more than two to four hours in the trunk. We conclude, therefore, that McDaniel's actions resulted in the victim's death and that for the purposes of *Enmund v. Florida, supra,* he did in fact kill.

## AGGRAVATING AND MITIGATING CIRCUMSTANCES

In reviewing the imposition of the death penalty it is our duty to review the record and make a separate and independent determination as to whether the death penalty is appropriate. *State v. McMurtrey,* 136 Ariz. 93, 664 P.2d 637 (1983); *State v. Zaragoza, supra.* In the instant case the trial court found one aggravating circumstance and no mitigating circumstances. The court found under A.R.S. § 13–703(F)(6) that the defendant committed the offense in an especially heinous, cruel or depraved manner. We agree. In *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983) we stated that cruelty "involve[s] the infliction of pain on the victims" and the "suffer[ing] of physical or mental pain prior to death." *Id.* at 51, 659 P.2d at 10. We have also held recently that the defendant must intend or reasonably foresee that there is a substantial likelihood that the victim will suffer as a consequence of the defendant's acts. *State v. Adamson,* 136 Ariz. 250, 665 P.2d 972 (1983). The evidence at trial established that McDaniel was a major participant in the beating, gagging and tying of Kaehler. The defendant, along with Mark Rich, then wrapped him in a blanket, carried him to the trunk of the car and locked him in the trunk. The trial record indicates that Kaehler was conscious and "banging" in the trunk during the drive to the apartment complex where the car was abandoned. These facts, aggravated by the extreme August heat, indicate that Kaehler suffered prior to his death as a result of the defendant's actions and that under these circumstances McDaniel should have foreseen the victim's suffering.

At the request of the defendant, no mitigation was presented at his sentencing hearing. As a result, the trial judge adopted the sentencing order made in connection with McDaniel's second trial which reviewed and rejected all of the statutory mitigating circumstances, as well as several additional mitigating circumstances presented and argued on the defendant's behalf. After concluding our independent review of the record, we do not believe that the trial court properly disposed of the issue regarding McDaniel's intent to kill.

When a defendant is being sentenced for first degree murder the sentencer must consider, as a mitigating circumstance and in addition to those factors enumerated in A.R.S. § 13–703(G)(1)–(5), any aspect of the defendant's character or record and any circumstance of the offense relevant in determining whether a sentence less severe than death is appropriate. *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *State v. McMurtrey, supra; State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979). Whether the defendant intended to kill is an important consideration when deciding if the death penalty is an appropriate sentence. This is largely because "[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859, 880 (1976). In discussing these purposes in *Enmund v. Florida, supra,* the Supreme Court stated:

"We are quite unconvinced, however, that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken. Instead, it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation,' *Fisher v. United States,* 328 U.S. 463, 484, 66 S.Ct. 1318, 1328, 90 L.Ed. 1382 (1946) (Frankfurter, J., dissenting), for if a person does not intend that life be taken or contemplate that lethal force will be employed by others, the possibility that the death penalty will be imposed for vicarious felony murder will not 'enter into the cold calculus

that precedes the decision to act.' *Gregg v. Georgia,* supra, 428 U.S., at 186, 96 S.Ct., at 2931.

\* \* \* \* \* \*

"American criminal law has long considered a defendant's intention—and therefore his moral guilt—to be critical to 'the degree of [his] criminal culpability,' *Mullaney v. Wilbur,* 421 U.S. 684, 698, 95 S.Ct. 1881, 1889, 44 L.Ed.2d 508 (1975). \* \* \*."

—— U.S. at ——, 102 S.Ct. at 3377–78, 73 L.Ed.2d at 1152–53.

 Turning to the case at bench, the only evidence of the defendant's intent to kill was his statement made while Kaehler lay on the floor tied up that "he was going to have to kill him \* \* \* because he wasn't going to the pen for no honkie."[2] There is, however, a good deal of evidence which suggests that the defendant and his accomplices did not intend to kill the victim. The car in which the victim was locked was left in an apartment complex where people would likely hear him inside the trunk. The windows to the car were left open and the keys were in the ignition so that somebody walking by who heard Kaehler in the trunk could get to the keys and let the victim out. There was also evidence that the defendant and Mark Rich had "pour[ed] liquor down [Kaehler's] throat" after beating him up. Taking this together with the manner in which the car was left in the apartment parking lot more probably suggests that McDaniel acted as he did for the purpose of insuring that when the victim was found he would not know where he was robbed and thus could not help the authorities discover the defendant's whereabouts. As previously discussed, the jury's general verdict finding McDaniel guilty of first degree murder does not assist in establishing his intent to kill since the jury could have convicted on either a premeditation or felony-murder theory. After concluding an independent review, therefore, we find that the defendant's lack of intent to kill is a mitigating circumstance sufficiently substantial to call for leniency in this case. We believe, however, considering the severity of McDaniel's offenses, justice will be served if the sentence for first degree murder is served consecutive to the sentences he received for robbery and kidnapping.

We have examined the record for fundamental error as required by A.R.S. § 13–4035 and find none. The judgments of conviction for first degree murder, kidnapping and robbery are affirmed. The sentences in connection with kidnapping and robbery are affirmed and are to be served concurrently. The sentence for first degree murder is reduced to life imprisonment without possibility of parole for 25 years, to be served consecutive to and after the defendant has completed serving his sentences for kidnapping and robbery.

HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.

---

**2.** McDaniel was on probation for a prior offense and knew that his probation would be revoked if the authorities found out about the beating of Kaehler.