**Roosevelt GRANDBERRY, Petitioner-Appellant,**

**v.**

**Jesse BONNER, Sheriff of Coahoma County, Mississippi, Respondent-Appellee.**

**No. 80–3778.**

United States Court of Appeals, Fifth Circuit.

Unit A

Aug. 20, 1981.

Rehearing and Rehearing En Banc Denied Oct. 6, 1981.

Tyree Irving, Greenville, Miss., for petitioner-appellant.

Karen Gilfoy, Asst. Atty. Gen., Jackson, Miss., for respondent-appellee.

Before RUBIN, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

On February 19, 1980, petitioner, Roosevelt Grandberry, filed a petition seeking a writ of habeas corpus in the United States District Court for the Northern District of Mississippi. In his petition, Grandberry alleged that he was being detained by Respondent Bonner pending a scheduled retrial on a murder charge and that this detention was unlawful because his first trial on this charge had ended when the trial judge, sua sponte, declared a mistrial in the absence of any manifest necessity for such action. Grandberry claimed that a retrial would, therefore, place him twice in jeopardy for the same offense in violation of the constitutional prohibition of double jeopardy.

The district court, after finding that Grandberry had exhausted all available state remedies, considered his petition on the merits and denied habeas relief. After reviewing the record of the events which prompted the declaration of a mistrial at Grandberry's first trial, we have concluded that the district court erred in determining that these circumstances constituted manifest necessity for a mistrial. Therefore, we reverse and order that the writ issue.

## I. THE STORY OF GRANDBERRY'S FIRST TRIAL

Grandberry's first trial on the murder charge began on February 11, 1980 in the Circuit Court of Coahoma County, Mississippi. The following evening at approximately 9:00 p. m., the case was submitted to the jury, which had been sequestered during the trial. After deliberating for ap-

proximately two hours, the jury indicated to the bailiff that they were as yet unable to reach a verdict. The trial judge then conferred with the district attorney and Grandberry's counsel in chambers. In the course of this conference, the trial judge proposed to inquire of the jury whether further deliberations on the following day would be helpful. Neither party objected to this proposal, however, Grandberry's counsel emphasized that: "[i]t is just our understanding that you are going to inquire as to whether or not coming back in the morning will aid them." The court replied "... I don't intend to release them, of course."

The court then reconvened, the jury returned to the courtroom and the following colloquy occurred:

BY THE COURT: Ladies and gentlemen of the jury, have you been able to agree on a verdict?

(Jurors shake heads to the left and right.)

BY THE COURT: Will someone speak up?

BY A BLACK, FEMALE JUROR: No, sir. We have not.

BY THE COURT: You have not been able to agree on a verdict?

BY THE SAME JUROR: No, sir, not at this time.

BY THE COURT: I realize that it has been a long period of time.... I will ask you is it the opinion of the jury that you are hopelessly deadlocked, or do you feel that if the Court permitted you to recess and to stay overnight and reconvene your deliberations tomorrow morning, if that would be any help to you in your deliberations?

BY THE SAME FEMALE JUROR: Yes, sir, it would be. I think we need to stay overnight.

BY THE COURT: All right, Ladies and gentlemen of the jury, as I stated, I realize it has been a long time for you. In view of the announcement that has been made, the Court will very shortly return you to the jury room and will direct that you recess from your deliberations....

Shortly thereafter, the bailiff reported to the trial judge that one of the jurors was ill. Petitioner, his attorneys and the assistant district attorney then returned to the courtroom where the trial judge questioned one of the jurors, Roosevelt Noah, about his condition. The exchange between the court and Mr. Noah formed the predicate for the declaration of a mistrial, therefore, we think it important to relate it in full.

BY THE COURT: ... Has a juror reported ill?

BY MR. ROOSEVELT NOAH: Yes, sir.

BY THE COURT: And this is Mr. Roosevelt Noah?

BY MR. NOAH: Yes, sir.

BY THE COURT: Mr. Noah, it is necessary for the Court to know if you in your own opinion are ill to the extent that you need medical treatment or that you would not be able to participate in further deliberations.

BY MR. NOAH: Well, Your Honor, I just need my high blood pressure pills and I will be okay.

BY THE COURT: The Court cannot be sending a doctor for you and such as that. I don't know where your pills are. I assume that you sent for your medicine last evening.

BY MR. NOAH: Well, my pills at my house.

BY THE COURT: Yes, sir, but did you not send home or give a note to the bailiffs for your medicine and other needs to brought here last night?

BY MR. NOAH: No, sir, not last night.

BY THE COURT: Well, you stayed here last night.

BY MR. NOAH: Yes, sir.

BY THE COURT: Is anyone at your home?

BY MR. NOAH: Yes, sir.

BY THE COURT: Do you understand that if the Court orders that someone call your home and those are brought here then this courthouse will be locked up for the rest of the night, and the Court does not want to enanger the health of anyone on this jury.

BY MR. NOAH: Well, if somebody go get me my pills, I imagine I will be okay.

BY THE COURT: Well, you say you imagine you will be okay. Do you understand that you will be here with the courthouse locked up?

(Juror mumbles)

BY THE COURT: I'm sorry, sir.

BY MR. NOAH: I say I don't know about that, about the courthouse being locked up because I could get a little worser.

BY THE COURT: That's the point that the Court is making. When we recess again, in fact, most people had already left, and when we recess again, the courthouse will be locked up and it will just be the twelve jurors and the two bailiffs here, Mr. Noah.

BY MR. NOAH: Well, Judge, I don't want to be here if I get a little worser and locked up and I can't get out no way.

BY THE COURT: All right, sir. I understand your position. Ladies and gentlemen, based on the statement that Mr. Noah has made to the Court, it is further on the Court and, of course, the officers of the court having concern for the health of anyone on the jury and further on the fact that the jury has deliberated since 9:05 this evening and it was 11:08 when the jury came in and said they had been unable to reach a verdict, but particularly on Mr. Noah's condition at this time and his reluctance to be left in the courthouse overnight without immediate availability of medical assistance, the Court does not feel it has any alternative but to declare a mistrial in this case. By doing so you will be discharged from service at this time, and the matter will be handled further as provided by law. In view of this ladies and gentlemen, what the Court has said, you may now return to the jury room. You may pack your bags. You are discharged. The Court will mail your check to you for your service. You have the appreciation of the Court and all the court officers for your public service as serving as jurors. Neither the Court nor anyone connected with the Court is critical of your being unable at this time to reach a verdict. I realize that the matter is serious as you realize, but the Court also realizes the health of one person on the jury is also a serious matter of concern and will not require the jury to continue to be sequestered overnight under the circumstances that medical help may not or probably would not be readily available. So with that statement, ladies and gentlemen, the Court will declare a mistrial in the case of State versus Roosevelt Grandberry. It will proceed as provided by law. You may go to the jury room, pack·your bags and you will be discharged.

After the jury returned to the jury room to gather their belongings, Grandberry's attorney approached the bench and asked for an opportunity to be heard regarding the propriety of the mistrial. The court deferred defense counsel's presentation until after the jury had left the courthouse, apparently because the jurors had to pass through the courtroom on their way out of the building. After the jury left, defense counsel objected to the declaration of a mistrial and to the court's failure to allow defense counsel an opportunity to be heard on the question prior to the discharge of the jury.[1]

On February 15, 1980 the circuit court held a hearing on Grandberry's "Motion to Quash and/or Dismiss Indictment for Double Jeopardy." At that hearing, Grandberry's counsel argued to the court that it had erred in declaring a mistrial during the first trial because Mr. Noah's condition was not so serious as to constitute a "manifest necessity." Grandberry's counsel contended that the court could have arranged for Mr.

---

1. Grandberry's counsel stated that he would "just like to register for the record . . . [an] objection to the Court declaring a mistrial in this case and also would object to the Court's failure to allow Defense Counsel to make objection to the declaring of a mistrial prior to the Court discharging the jury. . . . the Court did not then afford Defense Counsel an opportunity to state what Defense Counsel's position would be on that matter and that the only way Defense Counsel would have been in a position to state that would have been to interrupt the Court and butt in, which Defense Counsel feels would have been highly improper to butt in at that time, . . ."

Noah to get his medication and deferred any action until sufficient time had passed to determine whether Mr. Noah's condition would improve or consulted with counsel about the possibility of allowing deliberations to proceed with only 11 jurors. In the course of this hearing, the judge noted that his decision to declare a mistrial was prompted not only by Mr. Noah's assessment of his own condition but also by Mr. Noah's appearance at the time. The judge stated that Mr. Noah "was in a slouched position in his chair, almost horizontal, was perspiring profusely, and had a rather ashen look about him." Grandberry's counsel stated that he did not concur in the judge's description of Mr. Noah's condition.

Following this hearing, the circuit court judge denied Grandberry's motion. Thereafter, Grandberry exhausted the state remedies available to him by seeking review of the denial of his motion in the Mississippi Supreme Court. The Mississippi Supreme Court denied him any relief.

## II. THE STANDARD OF MANIFEST NECESSITY

The legal question posed by this case is not a new one. Well over a century ago, in *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), the Supreme Court held that under certain exceptional circumstances, the double jeopardy clause does not bar reprosecution of a criminal defendant following a mistrial declared without his consent or over his objection. *Perez* recognized that:

> "courts of justice ... [have] the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all of the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated .... To be sure, the power ought to be used with the greatest caution, under urgent circumstances and for very plain and obvious causes ...."

*Id.* at 580. Ever since *Perez*, the Court has rejected attempts to establish categories of circumstances constituting "manifest neces-

sity" and disapproved of appellate courts' application of "any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." *Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973). The phrase "manifest necessity" does not articulate "a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge." *Arizona v. Washington*, 434 U.S. 497, 506, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978).

The Supreme Court's reluctance to specify general categories of conditions and circumstances constituting "manifest necessity" reflects the deference which appellate courts are to give to a trial judge's considered determination that manifest necessity for a mistrial exists in a particular case. The decision to declare a mistrial is within the sound discretion of the trial court, *Arizona v. Washington, supra* at 514, 98 S.Ct. at 834; *Cherry v. Director, State Board of Corrections*, 635 F.2d 414, 418 (5th Cir. 1981). Thus, the mere existence of alternatives does not mean that the granting of a mistrial precludes retrial of the defendant where "reasonable judges could differ about the proper disposition," *Cherry, supra* at 419, and where the record, considered as a whole, indicates that the trial judge in deciding to declare a mistrial, carefully considered the alternatives and did not act in an abrupt, erratic or precipitate manner. *United States v. Jorn*, 400 U.S. 470, 487, 91 S.Ct. 547, 558, 27 L.E.2d 543 (1971); *Arizona v. Washington, supra*, 434 U.S. at 514–515, 98 S.Ct. at 834, 835; *Illinois v. Somerville, supra*, 410 U.S. at 469, 93 S.Ct. at 1072–1973. Although we are, therefore, cognizant of the deference generally accorded trial court determinations of the necessity for a mistrial, our review of the record in his case has convinced us that the decision to declare a mistrial in this case was made abruptly and precipitately with little careful consideration of the question whether Mr. Noah's condition was sufficiently serious to render him incapable of

further service as a juror and with equally little consideration of possible alternatives to a mistrial if Mr. Noah's condition was, in fact, so serious.

At no point during his colloquy with the judge did Mr. Noah indicate that his condition was so serious that he felt unable to continue his jury service. Indeed in response to a direct question from the court, Mr. Noah expressed no unwillingness to continue his jury service. Mr. Noah twice told the court that if he could simply take his blood pressure medication he would be "okay." He also told the court that there was someone at his home who, presumably, could have brought Mr. Noah's medication to the courthouse. At the time that the trial judge questioned Mr. Noah, immediately prior to the declaration of the mistrial, Mr. Noah's condition, as indicated by the record, was not clearly so serious that he could not continue to serve as a juror.

Although Mr. Noah understandably expressed some concern when the trial judge suggested to him that if his condition worsened during the night no medical assistance would be summoned for him, we find it incredible that if Mr. Noah, or any of the jurors, became seriously ill while sequestered at the courthouse, the bailiffs charged with the care of the jurors would not have been permitted to call an ambulance or a physician. The trial court's suggestion of such an inhumane and implausible scenario to Mr. Noah improperly pressured him into expressing misgivings about continuing his jury service.

Not only does the record in this case indicate that at the time the trial judge declared a mistrial, Mr. Noah's physical condition was not clearly so serious as to render him unable to continue his service and thereby create a "manifest necessity" for the trial judge to take some action (whether it be a mistrial or proceeding with less than a full complement of jurors), but also the pace at which the proceedings culminating in the judge's declaration of a mistrial moved indicates that the judge could not possibly have considered carefully any alternatives to declaring a mistrial. It was only a matter of minutes between the court's initiation of the exchange with Mr. Noah and the announcement of the mistrial. During this brief period, the court did not give counsel for either side any opportunity to object or consent to the declaration of a mistrial or to suggest alternatives to this move. The trial court's decision to declare a mistrial in this case exhibits all the characteristics of the type of erratic and precipitate action which the Supreme Court disapproved in *United States v. Jorn* and which we condemned in *United States v. Starling*, 571 F.2d 934 (5th Cir. 1978).

In *Jorn*, the Supreme Court held that the double jeopardy clause barred reprosecution of a defendant charged with willfully assisting in the preparation of fraudulent income tax returns. The trial judge in the first proceeding had declared a mistrial because he concluded that the taxpayer witnesses had not been adequately informed of their constitutional protection against self-incrimination, despite the witnesses' assurances that they understood their rights. In concluding that the mistrial was not a carefully considered response to a condition of manifest necessity, the court emphasized that the record in *Jorn* indicated that

> "the trial judge acted so abruptly in discharging the jury that, had the prosecutor been disposed to suggest a continuance or the defendant to object to the discharge of the jury, there would have been no opportunity to do so."

*Jorn, supra*, 400 U.S. at 487, 91 S.Ct. at 558. In *Starling*, we held that the United States could not reprosecute a defendant charged with embezzlement of a letter because the trial judge had abruptly declared a mistrial after "only a brief and confusing exchange between the court and the jury" regarding possibly prejudicial contacts between the defendant and the jurors, without affording counsel any opportunity to address the question of the propriety of such action and without considering any alternatives.

In *Starling* and *Jorn* the precipitate character of the trial judge's decision, as reflected by the rapid sequence of events documented in the record, was found to

**1016**

indicate that the judge had not devoted time or thought to alternatives or carefully considered the defendant's important interest in "being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate," *Starling, supra,* at 938 (quoting *Jorn, supra,* 400 U.S. at 486, 91 S.Ct. at 558), before declaring a mistrial. By contrast, in our recent decision in *Cherry, supra,* where we found that a mistrial which terminated the appellant's first trial did not raise a constitutional bar to his reprosecution, we emphasized that

> the action of the trial judge was not abrupt, but was taken only after inquiry and overnight deliberation, after at least some consultation with counsel during which Cherry's counsel rejected one available alternative, and after Cherry's counsel was afforded but declined the opportunity to make a motion.

*Id.* at 418.

The case before us today clearly bears a strong resemblance to *Jorn* and *Starling* and looks very little like *Cherry.* The trial judge in this case concluded the colloquy with Mr. Noah and then, without addressing either counsel and without pausing long enough for an objection to be registered, embarked on a rather extended statement in the course of which he declared a mistrial. This is precisely the type of abrupt and precipitate action which indicates, as we noted in *Starling,* "a total lack of awareness of the double-jeopardy consequences of the court's action and of the manifest necessity standard .... and a crucial failure to consider the appellant's protected interest in having the trial concluded in a single proceeding." *Starling* at 941. This is not a case where a trial judge merely failed to articulate explicitly his consideration of alternatives to a mistrial. *See Cherry, supra.* Rather, this is a case where the circumstances surrounding the decision to declare a mistrial, as chronicled in the record, reveal that no careful thought could have been given to alternatives. Therefore, we reach today the same conclusion the Supreme Court did in *Jorn,* and which we

have previously reached in *Starling*: the trial court in this case abused the discretion entrusted to it by declaring a mistrial under these circumstances and in this manner. We therefore conclude that a second prosecution of petitioner Grandberry is constitutionally barred and order that the writ of habeas corpus should be granted.

REVERSED and REMANDED for issuance of the writ.