680 P.2d 1259

**The STATE of Arizona, Appellee,**

v.

**John Harvey ADAMSON, Appellant.**

**No. 2 CA–CR 2709.**

Court of Appeals of Arizona,
Division 2.

March 19, 1984.

Review Denied May 11, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Barbara A. Jarrett, Asst. Attys. Gen., Phoenix, for appellee.

Martin & Feldhacker by Gregory H. Martin and William H. Feldhacker, Phoenix, for appellant.

## OPINION

HATHAWAY, Judge.

Appellant was tried and convicted of nine felony counts, including five counts of forgery. The longest sentence imposed was for 29 to 30 years, with several shorter sentences to run concurrently with this one. These sentences were ordered to run consecutively to a death sentence imposed on appellant in another case.

The case arose out of a connected series of events which culminated in the beating of Leslie Boros on February 24, 1975. Boros was a talent agent in Phoenix and

became romantically involved with one of his clients, Jennifer Tanner. Apparently Mrs. Tanner's husband found out about the affair and planned, with appellant and James Robison, to assault Boros. The series of events began in February 1975, when Boros received a phone call from someone saying that they had a singer and desired Boros' services as a talent agent. A meeting was arranged at a Phoenix hotel which the caller failed to attend. The purpose of the meeting was for Boros to hear the singer's audition tape. The caller, later identified as appellant, called Boros again on February 24, 1975, and arranged a meeting at the Scottsdale Sheraton for that evening.

Appellant arrived at the Sheraton without luggage or a reservation. He blamed his lack of baggage on airline malfeasance and his lack of a reservation on a third party. The testimony reveals that he made these problems widely known when he checked into the hotel. The evidence also establishes that appellant signed the room registration card and other hotel bills using the name of John Hart. He named as his employer Western Surety Company of Dallas, Texas, a company with which appellant was no longer affiliated. When selecting rooms, appellant insisted on a room at the rear of the hotel complex and was given room number 120. Appellant spent the next several hours waiting at the hotel for Boros to arrive. He had several drinks at the bar, tipping the bartender in excess of the bar tab and generally calling attention to himself.

Sometime before 8:30 that evening, Boros met appellant and the two men went to the bar. They ordered drinks, talked briefly and then appellant suggested that they go to his room to hear the audition tape. When they arrived at room 120, appellant opened the door and said that he had forgotten something and that he would return shortly. Within seconds after appellant exited, the room door was flung open by Stanley Tanner, who began beating Boros with a club. After a few minutes, Tanner stopped his attack. Robison entered the room soon thereafter and began tying Boros' leg to the bed. Tanner ordered Boros

to undress, which Boros did, and then Robison tied Boros' other leg to the bed. Tanner knocked a smoking pipe out of Boros' mouth and put it in Boros' rectum. At some point during this series of events, Boros lunged at Tanner in an attempt to get the gun which Tanner carried in one hand. Boros wrestled Tanner to the bed, but Tanner threatened to shoot Boros in the stomach if Boros didn't release him. After Boros let go, Tanner began accusing Boros of having an affair with his wife. Each time Boros offered an explanation or denied the affair, Tanner hit him with the club. Just before Tanner left, he took some sheep shears from a briefcase and shaved Boros' head and mustache. He also threatened to castrate Boros with a device used for castrating sheep, but decided against it. Tanner left the room a short time later.

Boros untied himself, attempted to remove the blood from his clothes, dressed and went home. At about 4 a.m. on February 25, Boros was called by Ann Thornton, a friend and client with whom Boros had an appointment later that morning. When Boros explained his experience of the past several hours, Ms. Thornton drove to Boros' house and they both went to the hospital. A doctor at the hospital put casts on both arms and eventually operated on Boros' right hand. Several days later Boros reported the incident to Richard Porter, Phoenix Assistant Police Chief and a deacon of the Mormon church. Boros asked that Porter not reveal this information because of threats made by Tanner and for other personal reasons. Nothing else was done about this for 1½ years, until Boros recognized appellant's picture in the newspaper in connection with a possible murder committed in room 120 at the Scottsdale Sheraton. At this time, Boros agreed to be a prosecution witness. Appellant was later charged for his role in the attack on Boros and with five counts of forgery.

The first issue raised on appeal is whether the prosecution committed reversible error by commenting in its closing argument on the fact that appellant refused to testify on his own behalf. The underlined portion of the following excerpt from the prosecu-

tor's closing statement is the basis for appellant's argument:

> "The same thing applies in a case, in a criminal case, where you are dealing with circumstantial evidence. This case is a good example. John Adamson used a phony name, a phony address, a ruse of coming to the motel in a taxicab from the airport, lost luggage. All that rigmarole [sic] he went through. And then signing in. Of course he didn't have any identification because it was all in his luggage, so he signed in with the name John Heart [sic]. And he did that for a reason.
>
> Now, he hasn't told us that. Nobody has told us he did it for a reason. But we know. We can figure out why he did it. You don't have to be told I did this for a reason to conclude that it was done for an illegal reason, because you look at the whole situation. You look at the lawn, you look at the sidewalks, you look at the trees; and you see why it was done. It was done so that John Adamson would not be held responsible for the bill. It was done so that John Adamson would not be responsible for what happened to Boros in the room. John Adamson was not to be connected with that at all. Who were they talking about, if Mr. Boros should go to the police? Who was he going to talk about? He was going to talk about John Heart [sic] from Dallas, Texas. That's who he was going to talk about. He didn't know Adamson." (Emphasis added)

■ It is constitutionally impermissible for a prosecutor to comment on a defendant's failure to testify in his own behalf. *State v. Mata*, 125 Ariz. 233, 609 P.2d 48, cert. den. 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980). This right is protected by statute in Arizona. A.R.S. § 13–117. However, to transgress the constitutional protection, the comment "must be adverse; that is, it must support an unfavorable inference against the defendant and, therefore, operate as a penalty imposed for exercising a constitutional privilege." *State v. Mata*, 125 Ariz. at 238, 609 P.2d at 53. We do not find that the prosecutor's comment was adverse in this case. Rather, it was made in the context of a discussion about circumstantial evidence and the evidence presented to the jury supporting the state's case. We find no reversible error.

The second issue is whether the trial court erred when it denied appellant's motion to vacate judgment. Specifically, appellant contends that the forgery conviction violated his Fifth Amendment right against double jeopardy because of his guilty plea and sentencing for defrauding an innkeeper in violation of A.R.S. § 13–318 (repealed Laws 1977, Chap. 142) arising from the same February 24 incident.

■ The double jeopardy clause provides constitutional protection against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *State v. Rumsey*, 136 Ariz. 166, 665 P.2d 48 (1983). To benefit from the double jeopardy protection, the defendant must properly raise it as a defense or it is waived. *State v. Morales*, 90 Ariz. 11, 363 P.2d 606 (1961); *State v. Owens*, 127 Ariz. 252, 619 P.2d 761 (App.1980); *People v. Moore*, 140 Cal. App.3d 508, 189 Cal.Rptr. 487 (1983); cf. *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). We are presented here with a constitutional defense raised for the first time in a post-trial motion. Since this defense is not jurisdictional, see *State v. Owens*, supra; *People v. Moore*, supra, Rules 16.1(b) and (c) of the Arizona Rules of Criminal Procedure, 17 A.R.S., preclude appellant from raising it after his trial has ended. Thus, appellant is deemed to have waived his double jeopardy defense.

■ Assuming arguendo that the defense was timely raised, the question becomes whether the two statutes, former A.R.S. §§ 13–318 and 13–421, were sufficiently distinguishable from each other to permit prosecution and conviction of each one separately based on the same series of events. The test to be applied is "whether each provision requires proof of an addi-

tional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932). A.R.S. § 13–318, at the time the offense was charged, read in pertinent part as follows:

> "B. *Any person who obtains food, lodging, or other service of accommodation at any such business establishment without paying therefor, with intent to defraud the proprietor or manager thereof, or who obtains credit at any such business establishment by the use of any false pretense,* or who after obtaining credit for food, lodging, or other service or accommodation at any such business establishment absconds or surreptitiously or by false means or by force, menace or threat removes any part of his baggage or other effects therefrom without paying for such food, lodging, or other service or accommodation is guilty of a misdemeanor, if the value of such food, lodging, other service or accommodation is one hundred dollars or less, and if the value of such food, lodging, other service or accommodation is more than one hundred dollars is guilty of a felony and shall be punished by imprisonment in the state prison for a term not exceeding five years." (Emphasis added)

A.R.S. § 13–421 (repealed Laws 1977, Chap. 142; recodified in A.R.S. § 13–2002), read, in pertinent part, as follows:

> "A. A person is guilty of forgery who, *with intent to defraud:*
>
> 1. *Signs the name of another person,* or of *a fictitious person, knowing that he has no authority so to do,* or falsely makes, alters, forges or counterfeits any charter, letters, patent, deed, lease, indenture, writing obligatory, will, testament, codicil, bond, covenant, bank bill or note, post note, check, draft, bill of exchange, contract, promissory note, due bill for the payment of money or property, receipt for money or property, ...."
> (Emphasis added)

The elements of § 13–318 included (1) the receipt of food, lodging or other hotel or lodging house service, (2) without paying for the food, lodging or other service and (3) with the intent to defraud the owner or manager. The elements of § 13–421 included (1) signing the name of a real or fictitious person, (2) without authority, (3) with the intent to defraud. The element of the forgery statute which did not exist in § 13–318 was the requirement that the party sign a document. An element which existed in § 13–318 but not in § 13–421 was receipt of food, lodging or other services from a hotel, motel, etc. We find that proof of each statutory violation included an additional fact not necessary for a violation of the other statute and that the prosecution and conviction for forgery did not violate the double jeopardy clause.

Affirmed.

BIRDSALL, C.J., and HOWARD, J., concur.