# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-01790-COA

CURTIS LESLIE                                                                    APPELLANT

v.

STATE OF MISSISSIPPI                                                              APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/08/2013 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | PHILLIP BROADHEAD |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| | JOHN R. HENRY JR. |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF ARMED CARJACKING AND SENTENCED TO FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, FOLLOWED BY FIVE YEARS' POST-RELEASE SUPERVISION, WITH THE SENTENCE TO RUN CONSECUTIVELY TO ANY AND ALL PREVIOUSLY IMPOSED SENTENCES, AND TO PAY A $350 FINE AND $394 IN RESTITUTION |
| DISPOSITION: | AFFIRMED - 03/10/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, J., FOR THE COURT:**

¶1.     Despite Curtis Leslie's efforts to mask himself, Travis Taylor recognized Leslie as one

of the two men who carjacked him. Taylor had been shooting pool with Leslie just an hour earlier, and Leslie was still wearing the same shirt when he robbed him. Leslie was indicted and tried for armed carjacking. His first trial resulted in a mistrial. But his second trial resulted in a conviction.

¶2. On appeal, Leslie argues his second trial was barred by the Double Jeopardy Clause. The key issue in Leslie's case was Taylor's identification of him. The identification was based on the clothes Leslie had been wearing that night. Leslie's lawyer told the judge certain Facebook messages showed that Taylor only knew of Leslie's attire because Leslie's Facebook messages described his clothing. Because of Leslie's lawyer's representations about the social-media postings, the judge let him question Taylor about the messages over the State's objection.

¶3. But after the questioning ensued, the judge learned Leslie's counsel had misrepresented the nature of the electronic communications. Indeed, the messages mentioned nothing about Leslie's clothing but instead were Leslie's communications claiming he did not carjack Taylor. After assessing Leslie's attorney's mischaracterizations and the effect of his questioning on the jury, the judge found admitting the actual Facebook page was out of the question. The judge held he could not admit Leslie's self-serving and unauthenticated denial that he committed the crime. To do so would allow Leslie to dispute his criminal involvement without taking the stand and being cross-examined. So the judge found the only viable alternative was to declare a mistrial.

¶4. When the State is granted a mistrial, as it was here, there must be "manifest necessity"

2

for the mistrial, to prevent a second trial being barred by double jeopardy.[1] And on appeal, Leslie claims because there was an alternative to declaring a mistrial—giving a limiting instruction—there was no manifest necessity. But the mere existence of alternatives does not bar a second trial. The decision to declare a mistrial is within the sound discretion of the trial judge. And in this case, the judge carefully considered his options, and in his sound discretion determined a mistrial was necessary. As this court is directed to accord the "greatest weight and respect" to the judge's reason for declaring mistrial,[2] we find from his order that he carefully explained his concerns and the high necessity required to try Leslie again.

¶5. In Leslie's second trial, contrary to his assertion, he was not prevented from presenting his theory of the case to the jury. Further, the jury's verdict was sufficiently supported by the evidence, which did not overwhelmingly weigh against the verdict. For these reasons, we affirm the judgment of conviction.

**Background Facts and Procedural History**

**I.      Carjacking**

¶6. On Sunday night, April 4, 2011, Taylor drove his girlfriend's 1996 Buick to a club in his small town of Benoit. Taylor shot pool with a man he knew as "B Love." Taylor noticed B Love was wearing a red, white, and blue collared shirt and blue jeans that night. And

---

[1] *Arizona v. Washington*, 434 U.S. 497, 505 (1978).

[2] *Jenkins v. State*, 759 So. 2d 1229, 1235 (¶24) (Miss. 2000) (quoting *Jones v. State*, 398 So. 2d 1312, 1318 (Miss. 1981)).

3

B Love's black hooded sweatshirt was draped over a chair near the pool table. Also at the club that night were "J Dub," "Little Eddie," and "B Ball."

¶7. After he left the club, Taylor was driving around Benoit when he noticed a problem with his stereo amplifier. So he pulled over. While he was working on his sound system, J Dub drove by and asked Taylor if he had seen someone named "Mookie." A while later, B Love and Little Eddie walked past.

¶8. Taylor got back into his car, but did not drive away. He was scrolling through Facebook on his smart phone, when J Dub came from behind his car up to the driver's side and put a gun in Taylor's face. J Dub told Taylor to move over. While Taylor was moving towards the passenger side, B Love got into the front passenger's seat, pinning Taylor between B Love and J Dub. While both men had masked their faces, Taylor recognized J Dub's voice. And Taylor recognized his second assailant as B Love because he could see his distinct red, white, and blue collared shirt poking out from underneath his black hoodie.

¶9. J Dub starting driving up Highway 1 North and eventually pulled over on a gravel road. B Love held Taylor while J Dub stripped off his clothes. J Dub then told the naked Taylor to run for his life. As Taylor took off, he heard a gunshot. He fell to the ground, staying down until he was sure J Dub and B Love had driven away.

¶10. Wearing only socks, Taylor started running back to Benoit. Around two in the morning, he reached Adam Thomas's house. Taylor knew Adam and knocked on his door. Adam loaned Taylor some clothes and a phone to call the sheriff's department.

¶11. According to Taylor, he told Adam he had been carjacked by J Dub and B Love. And

4

Adam responded that J Dub's real name was Jonathan Johnson and B Love's real name was Curtis Leslie. While Adam and Taylor were waiting on the sheriff, Little Eddie and B Ball,[3] along with another woman, pulled up to Adam's house.

¶12. According to Adam, however, while Taylor had told Adam he had been robbed, Taylor never said *who* robbed him. And though Adam had called Little Eddie, who showed up with B Ball and another woman, this trio did not arrive until after Taylor had left with the deputy sheriff. But B Ball testified they had arrived while Taylor was still there. B Ball also testified he had been at the club earlier shooting pool with Taylor and Leslie. And B Ball noticed Taylor was not wearing the same clothes he had on hours earlier, but instead the clothes Adam had loaned Taylor.

## II.    Investigation

¶13. Deputy Sheriff Mike Thomas received a call in the middle of the night about the carjacking. He met Taylor at Adam's house, and the two of them drove around Bolivar County in search of the Buick. They eventually gave up the search, and Taylor went to the hospital to get treatment for his feet, sore from running on the cold gravel road.

¶14. The next day Taylor came to the sheriff's department and identified the carjackers as Johnson and Leslie. In addition to the Buick and Taylor's clothes, Johnson and Leslie had stolen Taylor's wallet, camera, and cell phone. Deputy Thomas went and arrested the two men.

---

[3] Little Eddie's real name is Elliot Davis. And B Ball's real name is Edward Kimble.

¶15. Police Chief Billie Williams owns the club where Taylor and Leslie had been playing pool the night of the carjacking. Chief Williams was also there that night and saw Taylor, Leslie, Johnson, and B Ball. After he had gone home, he received a call about the carjacking. Like Deputy Thomas and Taylor, Chief Williams went out searching for the car. He later received a call that the Buick was located somewhere out in Bolivar County. After verifying the location of the car, he relayed this information to Deputy Thomas. Deputy Thomas reached the car in a heavy rainstorm, which had washed away any physical evidence both outside and inside the car, as the windows had been left rolled down.

¶16. Chief Williams also talked to Taylor the day after the carjacking. Taylor described to Chief Williams what the carjackers had been wearing. And Chief Williams testified Taylor's description matched the clothes Chief Williams had personally seen Johnson and Leslie wearing at the club the night before.

### III. First Trial

¶17. All the above evidence came out in Leslie's second trial. In the first trial, Leslie and Johnson were tried together. Because Leslie failed to provide a transcript from his first trial, the only record evidence we have related to this first trial is the trial judge's order declaring a mistrial.

¶18. From this order we learn that, just as in the second trial, Taylor's identification of his masked assailants as B Love and J Dub was a key issue. And the source of Taylor's knowledge of what these two men were wearing that night "became a strongly contested issue." During Taylor's cross-examination, Taylor was asked if he was on Facebook. The

6

defense then had a Facebook message from Leslie to Taylor, sent five months after the carjacking, marked as a defense exhibit. Leslie's counsel asked Taylor if the reason he remembered what Leslie was wearing that night was because Leslie had described his attire in his electronic messages to Taylor.

¶19. At this point the State objected to the Facebook messages as "hearsay" and "self-serving." Leslie's counsel responded—in front of the jury—these messages showed how Taylor really learned what Leslie was wearing. As Leslie's lawyer put it, the messages showed "the bias of the victim as to where his information is coming from as to how he can describe my client as to the clothes he's wearing." The judge then excused the jurors to delve into this issue further with counsel. During this recess, the judge raised serious concerns about hearsay and authentication issues with the messages. But counsel for Leslie and Johnson both insisted the messages were admissible, not to prove what Leslie had been wearing that night, but instead to show the true source of Taylor's knowledge about what Leslie had been wearing.

¶20. According to Johnson's counsel, the messages were "not meant [to] establish . . . what source it came from, saying it came from Mr. Leslie or from what source, but [instead they were meant to establish] he received the description of the clothing . . . via electronic information." Because both defense attorneys insisted the messages were admissible for this purpose, the court—despite concerns—permitted Leslie's counsel "to ask Taylor if he had received the subject clothing description by electronic means." But the judge did not allow the copy of the actual messages to be introduced into evidence and placed before the jury.

7

¶21. However, later in the day, the judge reviewed the copy of the Facebook page—the page that had been represented to contain a description of Leslie's clothing—and discovered "no such description contained on the subject page." Instead, the messages merely contained Leslie's profanity-laden insistence he was innocent and that Taylor had accused the wrong guy. In the judge's view, both defense attorneys had misrepresented that the messages contained a description of what Leslie had been wearing the night of the carjacking. And the result of this misrepresentation was that Leslie's counsel was wrongly permitted to ask Taylor, in front of the jury, if Facebook was the true source of his identifying information.

¶22. The judge "could think of no way to cure the misrepresentation" of the Facebook messages "short of admitting the inadmissible, non-authenticated, self-serving documentary evidence." So when the State moved for a mistrial, the judge granted it.

### IV. Second Trial and Conviction

¶23. Leslie was tried by himself six months later. At the end of the State's presentation of evidence, Leslie moved for a directed verdict, which was denied. Leslie neither testified nor offered any of his own witnesses. The jury found him guilty of armed carjacking. And the trial judge sentenced him to fifteen years in the custody of the Mississippi Department of Corrections, followed by five years' post-release supervision. Following an unsuccessful motion for a judgment notwithstanding the verdict and/or a new trial, Leslie timely

8

appealed.[4]

**Discussion**

## I.     Retrial

### *A.     Double Jeopardy*

¶24.   Leslie claims his second trial—the one resulting in conviction—violated his

constitutional protection from double jeopardy.[5]  *See* U.S. Const. amend V; Miss. Const.

---

[4] Leslie has different counsel on appeal.  Leslie is represented on appeal by the State Public Defender's Indigent Appeals Division, which has collaborated with the criminal-appeals clinic at the University of Mississippi's School of Law.

[5] Leslie raises this issue for the first time on appeal.  Following the mistrial, Leslie did not assert to the trial court his right to be protected against double jeopardy before, during, or after his second trial.  The State claims Leslie has consequently waived this issue.
   Generally, the failure to raise an issue before the trial court operates as a waiver of that issue on appeal.  *Love v. State*, 85 So. 3d 940, 942 (¶10) (Miss. Ct. App. 2012) (citing *Moffett v. State*, 49 So. 3d 1073, 1114 (¶139) (Miss. 2010)).  And according to the United States Supreme Court, though the issue of double jeopardy is a matter of constitutional right, it is not beyond waiver.  *Menna v. New York*, 423 U.S. 61, 62 n.2 (1975) ("We do not hold that a double jeopardy claim may never be waived.").  For this reason, the failure to assert to the trial court that a second trial violates double jeopardy has been deemed in some jurisdictions as a waiver of that issue on appeal.  *E.g., State v. Adamson*, 680 P.2d 1259, 1261 (Ariz. Ct. App. 1984) ("To benefit from the double jeopardy protection, the defendant must properly raise it as a defense or it is waived."); *Taylor v. State*, 851 A.2d 551, 552 (Md. 2004); *State v. Haney*, 842 A.2d 1083, 1084 (R.I. 2004).
   Following this logic, this court, in *Arrington v. State,* cited the failure to raise double jeopardy at the trial level as one of several reasons the defendant's double-jeopardy claim was barred on appeal.  *Arrington v. State*, 77 So. 3d 542, 546 (¶10) (Miss. Ct. App. 2011).  But the Mississippi Supreme Court has taken a different view from that of the United States Supreme Court.  Our state supreme court has instead expressly rejected the use of procedural bars against double-jeopardy claims.
   In *Graves v. State*, the supreme court addressed the merits of a double-jeopardy claim raised for the first time on appeal.  *Graves v. State*, 969 So. 2d 845, 846-47 (Miss. 1997).  Because "the protection against double jeopardy is a fundamental right," the court refused to apply any procedural bar.  *Id.*  Since *Graves*, the supreme court has "unequivocally"

9

art. 3, § 21. Leslie's double-jeopardy claim is like the one made in *Arizona v. Washington*, 434 U.S. 497 (1978), where the defendant was retried and convicted after the trial court granted the prosecutor's motion for a mistrial in the first trial. In this scenario, "[u]nlike the situation in which the trial has ended in an acquittal or conviction, retrial is not *automatically* barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused." *Id.* at 505 (emphasis added).

¶25. While the defendant has a "valued constitutional right to be tried by a particular jury," that "right is sometimes subordinate to the public interest in allowing the prosecutor one full and fair opportunity to present his case to an impartial jury." *Jenkins v. State*, 759 So. 2d 1229, 1234-35 (¶¶21-22) (Miss. 2000) (citing *Washington*, 434 U.S. at 503-05). But because a mistrial frustrates the defendant's valuable constitutional right, the prosecutor must show "manifest necessity" for a mistrial, in order to prevent a second trial from being barred by the Double Jeopardy Clause. *Washington*, 434 U.S. at 505. Because the judge in this case granted a mistrial at the State's request, the declaration of a mistrial had to be based on manifest necessity in order to lawfully retry Leslie.

        B.     *Manifest Necessity*

¶26. This court must "examine the entire record to determine if a manifest necessity

---

enforced its view that double jeopardy is a fundamental right not subject to procedural bars—including the bars in a post-conviction-relief action. *Rowland v. State*, 42 So. 3d 503, 508 (¶14) (Miss. 2010). In *Williams v. State*, this court followed the supreme court's clear directive and considered the merits of a double-jeopardy claim raised for the first time on direct appeal. *Williams v. State*, 94 So. 3d 324, 329 (¶16) (Miss. Ct. App. 2011). We do so again here.

exist[ed] for a mistrial." *Jenkins*, 759 So. 2d at 1232 (¶8). But as mentioned, Leslie has not provided this court with a transcript from his first trial. The only evidence in the record about Leslie's first trial is the trial judge's order declaring a mistrial. While this order contains selected excerpts from the transcript of the first trial, we do not have the actual trial transcript to fill in the gaps. Thus, our only insight into the events leading to the mistrial is through the trial judge's perspective.

¶27. Moreover, on this issue, the trial judge's perspective is entitled to "the greatest weight and respect." *Id.* at 1235 (¶24) (quoting *Jones v. State*, 398 So. 2d 1312, 1318 (Miss. 1981)). "[T]here is no simple rule or formula defining the standard of 'manifest necessity' or when exceptional circumstances exist justifying a declaration of mistrial by the trial court. The question is not easily answered." *Jones*, 398 So. 2d at 1318. For this reason, appellate courts must defer to "a trial judge's considered determination that manifest necessity for a mistrial exists in a particular case." *Grandberry v. Bonner*, 653 F.2d 1010, 1014 (5th Cir. 1981) (citing *Washington*, 434 U.S. at 834-35).

¶28. In *Washington*, the United States Supreme Court determined the reason the judge declared a mistrial—defense counsel's improper remarks in front of the jury—"f[ell] in an area where the trial judge's determination is entitled to special respect." *Washington*, 434 U.S. at 510. This is because the trial judge was familiar with the evidence and background of the case, listened to the tone of the improper argument, saw how the jurors reacted, and thus was in a much better position to make a determination of manifest necessity than the appellate courts. *Id.* at 514. Similarly here, the trial judge was in a much better position than

11

we are to evaluate the effect of the defense counsel's questions and remarks in front of the jury. Thus, his determination that there was "no alternative" but to declare a mistrial must be given deference. *See id.* at 511.

¶29. Leslie argues a mistrial was not manifestly necessary because the trial judge could have issued a limiting instruction. But "the mere existence of alternatives does not mean that the granting of a mistrial precludes retrial of the defendant[.]" *Grandberry*, 653 F.2d at 1014. Instead, the critical inquiry is: Did the trial judge carefully consider the alternatives versus abruptly declaring a mistrial? *Id.* Leslie argues this case is like *Jones*, in which the Mississippi Supreme Court determined a mistrial was not manifestly necessary when the State accidentally played the wrong confession tape. *Jones*, 398 So. 2d at 1318. But in that case, the trial judge simply granted the State's request for a mistrial, with no explanation why a mistrial would be manifestly necessary, while here, the trial judge carefully laid out his reason for a mistrial in his order.[6] *Id.*; *see also Grandberry*, 653 F.3d at 1014-15 (holding that the trial court's declaration of a mistrial had been made "abruptly" without considering

---

[6] In further contrast to *Jones*, in this case, it was the *defense counsel's misrepresentation*, not the State's mistake, that led to an improper line of questioning to be presented to the jury. In other words, unlike *Jones*, the State was not seeking a mistrial to cure its own mistake—it sought a mistrial because the defense was permitted to ask prejudicial and baseless questions because it mischaracterized the content of the electronic messages. And the only way the State could have countered the false suggestion made to the jury—that Taylor only knew what Leslie was wearing because of these messages—would have been to admit the messages, which were inadmissible, unauthenticated, riddled with racial slurs, and completely self-serving—aimed at exculpating Leslie. Leslie did not testify. But in the messages, he asserted he did not commit the crime. So if the messages been admitted, Leslie essentially would have been permitted to "testify" he did not do it, while not having to face cross-examination.

12

whether a juror's illness prevented further jury deliberations).

¶30. Instead of being like *Jones*, we find this case more akin to *Washington*, which also involved defense counsel making improper remarks in front of the jury. In that case, the Supreme Court acknowledged "some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions" about defense counsel's statements. *Washington*, 434 U.S. at 511. Thus, "[i]n a strict, literal sense, the mistrial was not 'necessary.'" *Id.* Still, the trial judge's view that a mistrial was necessary was entitled to deference. *See id.* And because "the trial judge exercised 'sound discretion' in handling the sensitive problem of possible juror bias created by the improper comment of defense counsel, the mistrial order [wa]s supported by the 'high degree' of necessity" required for double jeopardy not to attach. *Id.* at 516.

¶31. So too here the trial judge is entitled to deference in how he handled the improper questions defense counsel was permitted to ask, based on counsel's misrepresentations. While a mistrial may not have been absolutely necessary, and while another judge may have found a limiting instruction could have cured the situation, we must defer to the conclusion of this judge, who—after weighing the options and exercising his sound discretion—determined a mistrial was necessary. Thus, we find his decision is supported by the "high degree of necessity" required to permit the State to retry Leslie. *See id.*

**II. Leslie's Theory of Defense**

¶32. Leslie next argues the trial judge violated "his right to have jury instructions given which present his theory of the case." *Smith v. State*, 802 So. 2d 82, 88 (¶20) (Miss. 2001)

13

(citations omitted). According to Leslie, "[t]he key issue in the defense's theory of the case was Taylor's lack of credibility in identifying his alleged assailants." And "[t]he jury was not provided with instructions on weighing impeachment, even though [Adam] Thomas's testimony entirely contradicted Taylor's."

¶33. D-2, the instruction Leslie claims was erroneously refused, however, did not address conflicting testimony between witnesses. Instead, D-2 was an instruction about impeaching witnesses "by showing that on a prior occasion they have made a statement which is inconsistent with or contradictory to their testimony in this case."[7] As the trial judge rightly interpreted, D-2 was directed at a witness's own prior inconsistent statement being used to impeach the witness's current testimony. And while Taylor's testimony was contradicted by Adam's, it was not impeached by any prior inconsistent statement made by Taylor himself.

¶34. Leslie's trial counsel admitted as much at the jury-instruction conference when he told the judge he was "stuck" with D-2, which he had drafted in anticipation of impeaching Taylor on the stand with a previous written statement. But during cross-examination, Taylor

---

[7] D-2 read in its entirety:

The testimony of a witness or witnesses may be discredited or impeached by showing that on a prior occasion they have made a statement which is inconsistent with or contradictory to their testimony in this case. In order to have this effect, the inconsistent or contradictory prior statement must involve a matter which is material to the issues in this case.

The prior statement of the witness or witnesses can be considered by you only for the purpose of determining the weight or believability that you give to the testimony of the witness or witnesses that made them. You may not consider the prior statement as proving the guilt or innocence of the defendant.

14

could not identify and authenticate the statement as being his, so Leslie's counsel dropped the issue and moved on to another line of questioning.

¶35. On appeal, Leslie claims that without D-2 the jury was not properly instructed on how to weigh credibility and impeachment issues surrounding Taylor's testimony. Leslie argues Taylor's testimony—particularly the part where he testified Adam told him B Love's and J Dub's real names—was clearly impeached by Adam's contradictory testimony. This argument does not match up with the language of D-2. While Leslie focuses solely on the words "impeached" and "contradictory," those words must be understood in their context. And reading the entire instruction, it is clear this instruction is *specifically tailored* to address impeachment by Taylor's *own* prior statement that contradicted his trial testimony. It does not address—and thus could not properly instruct the jury on—how to weigh a witness's credibility when another witness gives contradictory testimony. In other words, D-2 does not present Leslie's theory of the case. *See Smith*, 802 So. 2d at 88 (¶20). So Leslie was not entitled to the instruction. *See Phillipson v. State*, 943 So. 2d 670, 671 (¶6) (Miss. 2006) ("The court may refuse an instruction [that] . . . is without foundation in the evidence.").

¶36. Leslie's theory of the case boils down to the credibility issues surrounding the State's key witness. And the jury was properly instructed on their role of assigning what weight and credibility each witness's testimony should receive. In the given instruction C-2, the jury was instructed, "[a]s the sole judges of the facts in this case," to use "good common sense and sound honest judgment" and "determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case." Thus, Leslie's

15

right for the jury to be instructed on his theory of defense was not violated.

### III. Sufficiency and Weight of the Evidence

¶37. Finally, Leslie argues the judge should have granted his motion for a directed verdict or, alternatively, his motion for a new trial.

#### A. Sufficiency of the Evidence

¶38. A motion for a directed verdict challenges the sufficiency of the evidence. When reviewing the sufficiency of the evidence, this court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)).

¶39. Leslie asserts no rational juror could have found, beyond a reasonable doubt, that he was the second man who forced his way into Taylor's car and participated in the carjacking. He argues there were too many weaknesses in the State's presentation. But in reviewing the sufficiency of the evidence, we give the State "the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Hughes v. State*, 983 So. 2d 270, 276 (¶11) (Miss. 2008). Thus, a reasonable juror could have drawn from Taylor's testimony that he recognized his assailants right away as J Dub and B Love, that he told Adam that night J Dub and B Love were the ones who robbed him, that he described the two men to Chief Williams the next day, and that he identified them to Deputy Thomas, which is why Deputy Thomas arrested them. In other words, the jury could have reasonably concluded that Adam was not being truthful or accurately remembering what had happened when he testified, contrary to

16

Taylor, that he did not tell Taylor J Dub's and B Love's real names.

¶40.    In *Johnson v. State*, 81 So. 3d 300, 305 (¶14) (Miss. Ct. App. 2012), this court found the evidence was sufficient to support a conviction of armed carjacking.  In that case, it was clear the jury believed the victim's testimony that two men, acting in concert, "took possession of [the victim's] car through the use of a gun."  Though the defendant, Johnson, "did not drive [the victim's] car or request to be taken anywhere," Johnson was still guilty of armed carjacking, as an aider and abettor.  *Id.*  Similarly here, the jury obviously believed Taylor's testimony that Johnson used a gun to take possession of Taylor's car and that Leslie aided and abetted him by pinning Taylor down while Johnson drove.  Because the evidence was sufficient to convict Leslie of armed carjacking, Leslie's motion for a directed verdict was properly denied.

### B.    Weight of the Evidence

¶41.    "A motion for new trial challenges the weight of the evidence." *Dilworth v. State*, 909 So. 2d 731, 737 (¶20) (Miss. 2005).   This court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice."  *Bush*, 895 So. 2d at 844 (¶18).  Just like the review of the sufficiency of the evidence, a review of the weight of the evidence views the evidence "in the light most favorable to the verdict."  *Id.*

¶42.    Leslie acknowledges that the standard of review for motions for new trial is high. Only in "exceptional cases," where the jury's verdict is based on "extremely weak or tenuous evidence," will a new trial be considered.  *Dilworth*, 909 So. 2d at 737 (¶¶21-22).  Still,

17

Leslie asserts the conflicts among the State's witnesses tip the scales in favor of a new trial.

¶43. In *Latiker v. State*, a case handed down eight months after *Bush*, the supreme court applied the newly coalesced weight-of-the-evidence standard to find there was no reason to grant a motion for a new trial. *Latiker v. State*, 918 So. 2d 68, 75-76 (¶¶10-12) (Miss. 2005) (citing *Bush*, 895 So. 2d at 844 (¶18)). While there were "stark" differences in the testimony the jury heard, the supreme court noted "[i]t is common for the jury to be called upon to resolve sharp and irreconcilable differences in the evidence presented for its consideration." *Id.* at (¶12). After all, "[i]t is the jury's job to balance the weight and credibility of the witnesses." *Id.* (citing *Shamblin v. State*, 601 So. 2d 407, 412 (Miss. 1992)).

¶44. Thus, guided by *Latiker*, this court must defer to the jury's resolution of weight and credibility issues arising from conflicting testimony. *Id.* at 75-76 (¶¶10-12); *see also Hayes v. State*, 2013-KA-00376-COA, 2014 WL 2579676, at *3 (¶13) (Miss. Ct. App. June 20, 2014) (mandate issued July 1, 2014) (holding that, when testimony conflicted as to what happened, it was up to the jury to determine the defendant's involvement in the armed carjacking).

¶45. In his closing argument, Leslie's trial counsel highlighted for the jury the discrepancies between Taylor's version of events and Adam's. Thus, the jury was well aware this was an issue it would have to resolve before finding Leslie guilty. The jury obviously found Taylor to be more credible and assigned greater weight to his testimony—as was its prerogative to do.

¶46. There are two other reasons Leslie claims the evidence was too tenuous to allow his

conviction to stand—(1) the fact Taylor did not go into great detail the night of the carjacking when talking to Adam, Deputy Thomas, Little Eddie, and B Ball, but yet was able to describe in great detail what happened two years later on the witness stand; and (2) the "lack of investigation" by Deputy Thomas, including the failure to gather any physical evidence. The first reason is directly refuted by Chief Williams. Indeed, it was Chief Williams who testified that, soon after the carjacking, Taylor *did* go into detail with him about what the carjackers had been wearing. And Chief Williams remembered Leslie wearing the same clothing described by Taylor.

¶47. We similarly find Leslie's second given reason is not sufficient to overturn a verdict. "The absence of physical evidence does not negate a conviction where there is testimonial evidence." *Hayes*, 2014 WL 2579676, at *3 (¶13) (quoting *Graham v. State*, 812 So. 2d 1150, 1153 (¶9) (Miss. Ct. App. 2002)). Like this case, *Hayes* involved an armed carjacking. Included in Hayes's challenge to the evidence was his assertion that police failed to obtain any surveillance video from nearby businesses. But this court affirmed, finding the lack of physical evidence did not present an "unconscionable injustice." *Id.* Here, Deputy Thomas gave a reasonable explanation why no physical evidence was taken from the car once it was found—there had been a thunderstorm, which soaked the car through its open windows. Furthermore, Leslie's trial counsel pointed out during closing argument that the State had no physical evidence. So the jury obviously did not see this as a barrier.

¶48. All the evidentiary issues Leslie raises on appeal were presented to the jury, which resolved them in favor of finding him guilty beyond a reasonable doubt. As in *Hayes*, we

19

find no "unconscionable injustice" in allowing the jury's verdict to stand.  Therefore, we affirm.

¶49.   **THE JUDGMENT OF THE BOLIVAR COUNTY CIRCUIT COURT OF CONVICTION OF ARMED ROBBERY AND SENTENCE OF FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, FOLLOWED BY FIVE YEARS' POST-RELEASE SUPERVISION, WITH THE SENTENCE TO RUN CONSECUTIVELY TO ANY AND ALL PREVIOUSLY IMPOSED SENTENCES, AND TO PAY A $350 FINE AND $394 IN RESTITUTION IS AFFIRMED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO BOLIVAR COUNTY.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR.  IRVING, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**